CRAWFORD PAINTING & DRYWALL COMPANY, Plaintiff–Appellee,

v.

J.W. BATESON CO., INC., Defendant–Appellant.

No. 87–5545.

United States Court of Appeals, Fifth Circuit.

Aug. 10, 1988.

Jerry P. Jones, G. Luke Ashley, Madeline B. Johnson, Dallas, Tex., for defendant-appellant.

John M. Wickwire, Vienna, Va., for plaintiff-appellee.

Before WISDOM, REAVLEY and POLITZ, Circuit Judges.

REAVLEY, Circuit Judge:

Claiming breach of contract, fraud, negligence and civil RICO violations, the subcontractor who lost money on a large construction contract has recovered over $7,000,000 by the district court's judgment. Finding no legal basis for a recovery, we reverse the judgment and dismiss the cause.

## A. BACKGROUND

J.W. Bateson Co., Inc. executed a contract with the United States Army Corps of Engineers on September 19, 1976 to do extensive remodeling and new construction at Wilford Hall United States Air Force Area Medical Center in San Antonio, Texas. Bateson and Crawford Painting and Drywall Company executed a contract on March 14, 1977 for Crawford to do the drywall work for $2,164,000. Bateson, Crawford, and the other sixteen subcontractors encountered difficulties on this project from the beginning. Reliable drawings of the existing facilities were not available. Construction had to proceed around the continuing operation of a very large hospital. But the largest source of trouble was the great volume of the change orders. As is so often the case, as the medical personnel and hospital administrators became conversant with the plans prepared by the Corps, the user insisted on modifications which the Corps then required of the prime contractor. In the early stages of the construction, Bateson would receive as many as 20 change orders in a week. Though the scheduled completion date was originally July 30, 1981, the project was not finally completed until August 4, 1983.

One document, often discussed in this record and identified as P00253, was an agreement between Bateson and the Corps on April 19, 1979 to extend the time for the completion of the contract and its phases. By that agreement an additional 148 compensable work days were allowed to the contractors. Additional extensions were necessary before the actual completion.

Knowing that all of the subcontractors, as well as Bateson itself, were entitled to

pursue substantial claims for additional compensation against the Corps under the Contract Disputes Act, 41 U.S.C. §§ 601 et seq., Bateson brought all of the subcontractors together in the spring of 1982 for the purpose of collaborating on a joint claim. The parties signed what was called the Liquidation Agreement for that purpose, and they did file with the Corps a joint claim which covered the claims of each subcontractor and the prime contractor. Crawford executed these documents on October 28, 1982.

During the course of negotiations in early 1984 Bateson and the Corps agreed upon a certain number of extra compensable days of construction. That number was less than the number claimed in the 1982 documents. When Crawford was advised of this negotiated number, his investigation led him to believe that Bateson had released and cut off the subcontractors from any delay claim prior to the 1979 P00253 and that this was the cause of the reduction in compensable days which Bateson purported to agree upon in 1984. Crawford then revised its own claim and, after a delay to obtain an unqualified certification by Bateson for the Corps, the revised claim was finally accepted by the Corps. This claim has since been denied by the contracting officer of the Corps and is pending in the Court of Claims. *See* 41 U.S.C. § 609(a)(1).

Looking at the evidence in the worst light for Bateson, as we must do in the face of the jury verdict, Crawford was left in the dark on requests and agreements between the Corps and Bateson to change and reschedule the work. By the time of the 1979 negotiations between owner and prime contractor, the latter was at some risk because of possible liability for liquidated damages due to the contractor's failure to meet the contract schedule. The jury was entitled to believe that, in negotiating with the Corps, Bateson's concern was not to protect the claims of Crawford so much as to care for its own position in the balance between its potential liability to the Corps and its own claims against the Corps.

Crawford filed this lawsuit against Bateson on March 28, 1985. Federal jurisdiction was predicated on civil RICO counts under 18 U.S.C. § 1964(c), and other claims were made under state law for fraud, breach of contract, and negligence. The trial commenced on November 4, 1986 and concluded on December 22. It required 18 days of testimony and several boxes of exhibits. The tone of the trial was set by the opening statement of Crawford's attorney when he told the jury "that J.W. Bateson Co. abused and defrauded Mr. Crawford in the course of the construction of that project and caused Mr. Crawford to lose a business that it took him over 50 years to establish." He contended in this opening argument, as has been contended in all of the court papers and throughout the proceedings, that the case is marked by the "landmark of fraud, and it runs through this project just like the San Antonio River runs through San Antonio...."

Two witnesses, the son of the owner of the Crawford Company and a professor of economics, testified on Crawford's damages. But no evidence was submitted to relate any item of damage to specific acts or omissions of Bateson. These witnesses simply took all of Crawford's financial experience during the Wilford Hall project, including the collapse of the Crawford business, and added the losses together for very large totals. Johnny Crawford, for example, presented two different computations which he called his performance method and shortfall method. The performance method added together the same items claimed against the Corps for job delay, with very large costs of borrowing because of interest paid to banks for short term credit, the loss of the business, legal and professional fees in the controversy and lawsuit with Bateson, and arrived at a total of $1,779,152.41. By the shortfall method he added all costs of Crawford in connection with the Wilford Hall project, together with 15% for administrative overhead and 10% for profit, plus the very large outlays for interest expense during these years. From this he deducted the $2,665,-000 paid by Bateson for the project work, leaving total shortfall damages of $3,178,-

013. The economics professor computed damages by his "claims method" at $1,778,-740.18 to which he added the interest costs for $3,659,958. In his shortfall computation he allowed for all of the profits on other jobs that Crawford would have made if it had not undertaken the Wilford Hall project, and added the other losses and costs for total damages computed to be $5,085,658.

The jury was apparently impressed by plaintiff's presentation. Plaintiff failed only on its civil RICO claim. The jury found for the plaintiff on fraud, breach of contract, and negligence. The judgment of the trial court was based upon findings of $2,383,333.33 damages for fraud and an award of $4,000,000 punitive damages. Attorneys fees were awarded of $730,000.

It should be immediately apparent from the first reading of these briefs that the fraud award and the punitive damages cannot stand. What is not easy to determine, beneath the needlessly huge record and verbose argument, is the merit—rather the lack of merit—of specific legal claims. Our efforts in that search are aided by turning to the verdict of the jury and considering each finding in favor of the plaintiff as it relates to the allegations in the plaintiff's Third Amended Complaint. That is the source of the outline we now follow.

## B. PLAINTIFFS CLAIMS, THE JURY VERDICT, AND GOVERNING LAW

1. Fraud in the Administration of the Subcontract (Count VII in Plaintiff's Third Amended Complaint)

■ a. Bateson maintained "secret schedules." There is evidence that Bateson did not always tell all of the subcontractors about time extensions for the construction or reveal Bateson's own schedule. We are not prepared to hold that a prime contractor cannot plan a construction schedule without making full disclosure to every subcontractor. Schedules may be goals or may be deadlines. They may reflect dates that the Corps is yet to accept for some contract change. The subcontractor could conclude that the "schedule" permits him to delay work that he might otherwise have done earlier. The worse that could be said in connection with the failure to inform Crawford is that Bateson was failing to perform its obligation to coordinate the contract. A breach of this obligation would subject Bateson to liability if it were not for paragraph 9 of their contract which provided that Crawford could not recover an increase in the contract price or damages due to delay caused by Bateson. *See E.C. Ernst, Inc. v. Manhattan Constr. Co. of Tex.*, 551 F.2d 1026, 1029 (5th Cir.), *reh'g denied in part, granted in part*, 559 F.2d 268 (5th Cir. 1977); *cert. denied*, 434 U.S. 1067, 98 S.Ct. 1246, 55 L.Ed.2d 769 (1978). It should be emphasized that the duty to coordinate and to keep the subcontractor informed about the progress of the project is a contractual duty, and a violation would not support a tort claim. Even if the breach were malicious and intentional, the claim could not arise above one based on the contract itself. *See Amoco Prod. Co. v. Alexander*, 622 S.W.2d 563, 571 (Tex.1981).

■ What is very clear is that no actionable fraud claim exists. Texas law establishes the following elements of actionable fraud: (1) a material representation; (2) the representation was false; (3) when it was made the speaker knew that it was false or made it recklessly without any knowledge of the truth but as a positive assertion; (4) he made it with the intention that it should be acted upon by the party; (5) the party acted in reliance upon the representation; (6) the party thereby suffered injury. *Stone v. Lawyers Title Ins. Corp.*, 554 S.W.2d 183, 185 (Tex.1977). Most, if not all, of those elements are lacking in the present case. No misrepresentation was made, and the failure to disclose information is not and cannot be common law fraud in Texas in the absence of a fiduciary relationship between the parties. *See Tempo Tamers, Inc. v. Crow–Houston Four, Ltd.*, 715 S.W.2d 658, 669 (Tex.Civ.App.—Dallas 1986, writ ref'd n.r.e.). Crawford contends that a fiduciary relationship existed at all times between these two parties. The argument is spurious. Nothing in this record supports that claim except some expres-

sions that the parties did trust and have confidence in each other. The same could be said, we can hope, about most of the people we deal with each day; but it does not follow that all of us are legal fiduciaries. Bateson and Crawford had a sophisticated business relationship and dealt with each other at arms length. There was no fiduciary relationship, no fiduciary duty, and no fraud. *See Richman Trusts v. Kutner,* 504 S.W.2d 539, 544–45 (Tex.Civ. App.—Dallas 1973, writ ref'd n.r.e.).

■ b. Bateson concealed and failed to transmit to Crawford for pricing purposes a change in construction that allowed the installation of electrical conduit outside of the floor or ceiling slabs. The consequence of this modification in the construction impeded Crawford's workers and caused them some delay. What was said above applies to this matter, a dispute that wasted many hours in the trial of this case. In addition, the change was fully known to the Crawford personnel as early as 1977. Any claim for damages would have been barred by limitations.

■ c. Bateson's concealment of P00253. There are two different considerations here. The first is the rephasing or extension of the contract as a result of this agreement between the Corps and Bateson in 1979, which Crawford did not see until 1984. P00253 did not change the construction; it only incorporated prior time extensions because of prior change orders. We fail to see any effect of this agreement upon Crawford, but if there was any relation to Crawford's work, it would be by causing some extra delay. It must be recognized that the only factor about this job which Crawford claims to have caused it damages was *delay.* Crawford has many complaints of omissions that led to delay. It may have suffered financial reverses as the result of the delay. But the critical factor and only factor that did the damage was delay. The remarkable part of this picture is that, at this late date, Crawford has presented no proof that Bateson contributed to some degree to the job delay. In fact, Crawford's position has been, and

its present claim to the Corps is, that all of the delay was caused by the Corps.

Furthermore, any rearrangement or scheduling, if P00253 did affect the work itself, was known by Crawford's people working on the job long prior to March 28, 1981, the bar date of the statute of limitations.

■ The other contention relative to P00253 is that the document itself withdrew all of Bateson's prior protests on price modifications and released all claims for increased costs for prior delay caused by the Corps. This contention ignores the fact that the Bateson representative in executing P00253 referred to his attached letter by which Bateson specifically reserved all rights for increased costs for prior delay. Crawford argues that in the settlement with the Corps in 1985 Bateson concedes the binding release of P00253. The 1985 settlement does not change the effect of the 1979 documents and it expressly provides that it does not affect the claim of Crawford against the Corps.

2. Breach of the Liquidation Agreement and Fiduciary Relationship (Count V of Plaintiff's Third Amended Complaint)

■ a. Bateson concealed the contents of P00253 from Crawford until August of 1984. Bateson concedes that a fiduciary relation was established by the Liquidation Agreement after June 15, 1982 in the course of the joint effort to present the claim to the Corps. The duty did therefore exist to reveal to Crawford this document insofar as it affected the compilation of information for presentation of the claim to the Corps. This effect upon Crawford is entirely different from job delay and the release contention discussed above.

b. Bateson misrepresented in 1982 that it had made a full disclosure of all facts relevant to its claim against the Corps.

c. Bateson concealed from Crawford the fact that the Corps took the position in its negotiations with Bateson that all claims for costs due to delay prior to 1979 had been released by P00253.

■ All of the above three items may be assumed to have had an effect upon Crawford insofar as it was preparing and presenting its claim to the Corps. Again, this has nothing to do with delay or expenses in the performance of the contract. At most, Crawford was delayed in processing its claim and went to greater expense in the preparation of its revised claim because of the failure to disclose by Bateson. However, plaintiff has not alleged or proved damages of this nature.

Items (a) and (b) above were within the jury's specific findings of fraud for which total damages of $2,383,333.33 were assessed. A separate issue (c. above) was submitted to the jury by which it was found that Bateson concealed the Corps position. The jury then found damages as the result of this concealment to be $30,000. Perhaps the jury tried to manufacture a figure for damages that would be related to this particular nondisclosure. Again, plaintiff did not seek these limited damages and made no proof at all of its outlays for this reason.

### 3. Breach of Contract (Count II in Plaintiff's Original Complaint)

a. Bateson failed to keep Crawford informed of scheduling and pricing changes.

b. Bateson failed to request that Crawford submit its pricing to make change orders.

c. Bateson failed to consult Crawford on change orders.

■ These failures damaged Crawford only because of the delay, for which the contract does not permit Crawford to recover damages against Bateson. This was explained above. In addition, these claims are all barred by limitations. The jury found that each of the omissions occurred prior to March 28, 1981. The jury also found that Bateson was guilty of fraudulent concealment of this conduct. The significance of this finding is supposed to effect the postponement of the running of limitations. The evidence in this case will not support the fact finding or Crawford's position. "The estoppel effect of fraudulent concealment ends when a party learns of facts, conditions, or circumstances which would cause a reasonably prudent person to make inquiry, which, if pursued, would lead to discovery of the concealed cause of action. Knowledge of such facts is in law equivalent to knowledge of the cause of action." *Borderlon v. Peck,* 661 S.W.2d 907, 909 (Tex.1983). Crawford knew all of these changes as they were made on the job itself. Crawford knew who was dealing with the Corps and how the change orders were made and, though it may not have known of the paperwork, Crawford personnel certainly knew of the construction itself.

### 4. Negligence (Count IV of Plaintiff's Original Complaint)

■ The jury found the very same acts or omissions to be negligent as are set forth above as the three breach of contract violations. The jury also made the same findings with reference to limitations—that the failures occurred prior to March 28, 1983 (there being a two year statute applicable to negligence) but that Bateson was guilty of fraudulent concealment. What was said above with reference to the breach of contract claim applies here. In addition, the negligence cause of action should be disregarded because these obligations are all determined by the contract and are contractual in nature. *See Alexander,* 622 S.W.2d at 571.

### Conclusion

We conclude that Crawford has failed to establish any liability of Bateson. The judgment of the district court is reversed and judgment is here rendered dismissing the cause of action.

REVERSED AND RENDERED.