**RALSTON PURINA COMPANY,**
Appellant,

v.

**William H. McKENDRICK d/b/a Farm
& Ranch Mart, Appellee.**

No. 04–92–00132–CV.

Court of Appeals of Texas,
San Antonio.

Feb. 24, 1993.

Rehearing Denied April 13, 1993.

David L. Ylitalo, George Cowden, III, Jeffers, Brook, Kreager & Gragg, San Antonio, J.C. Trevino, III, Mann, Trevino, Hale & Gallego, Laredo, for appellant.

Mark C. Harwell, David A. Furlow, Morris & Campbell, P.C., Houston, for appellee.

Before CHAPA, BIERY and GARCIA, JJ.

**OPINION**

BIERY, Justice.

Based on a jury verdict[1], William McKendrick (plaintiff/appellee) recovered judgment against Ralston Purina Company (defendant/appellant) for fraudulent nondisclosure and tortious interference. In seven points of error, Ralston Purina contends the trial court erred in (a) rendering judgment for fraudulent nondisclosure, (b) rendering judgment for tortious interference, and (c) awarding prejudgment interest. The dispositive points are: (1) points one and two which allege error in rendering judgment for fraudulent nondisclosure because Purina had no duty to disclose information relating to its Dealer Identification and Trademark Contract; (2) point four in which Purina contends the trial court erred in awarding McKendrick prejudgment interest; and (3) point five wherein Purina argues the trial court erred in rendering judgment for tortious interference because the prospective contract between McKendrick and the Hipodromo was void. We affirm in part, modify in part and reverse and render in part.

A review of the business history of the parties is in order. Mr. McKendrick, who had been interested in acquiring a Purina dealership for some time, learned a dealership was to be sold at an auction to be conducted by Gary Knostman, a bankruptcy trustee. Purina's district manager at

1. *Question No. 1*
 Do you find from a preponderance of the evidence that Purina knowingly failed to disclose material facts relating to the Dealer Identification and Trademark Contract for the purpose of inducing William H. McKendrick, III, into purchasing the Julian M. Trevino Feedstore and that William H. McKendrick relied upon it?
 ANSWER: YES
 *Question No. 2*
 Based upon a preponderance of the evidence, what amount do you find to be the amount of the actual loss directly or proximately caused to Bill McKendrick by Purina's fraudulent nondisclosure, if any?
 ANSWER: $ 104,000.00
 *Question No. 3*
 What amount of money, if any, do you find from a preponderance of the evidence should be awarded against Purina as exemplary damages for the nondisclosure you found in Question No. 1?
 ANSWER: $ 60,000.00
 *Question No. 4*
 Do you find from a preponderance of the evidence that there was a reasonable probability that Bill McKendrick would have entered into a contract for the sale of feed to the Hipodromo?
 ANSWER: YES
 *Question No. 5*
 Do you find from a preponderance of the evidence that Ralston Purina intentionally and maliciously interfered with the prospective business relationship between William H. McKendrick and the Hipodromo?
 ANSWER: YES
 *Question No. 6*
 What amount of damages, if any, do you find were proximately caused to Bill McKendrick as a consequence of Purina's prevention of Bill McKendrick's contract with the Hipodromo?
 ANSWER: $ 40,000.00
 *Question No. 7*
 What amount of money, if any, do you find from a preponderance of the evidence should be awarded against Purina as exemplary damages for the tortious interference you found in Question No. 5?
 ANSWER: $125,000.00

this time was Royce McEver. In order to accommodate the bankruptcy trustee's desire to hold a competitive auction and Purina's requirement that it be allowed to approve all dealers, Mr. McEver engaged in a pre-auction approval process for prospective bidders. Mr. McKendrick contends, and Purina does not dispute, that when McKendrick met with McEver to gain approval, McKendrick asked whether there would be any written contracts for the dealership with Purina and McEver told him "no," it was a handshake deal, and "the only thing that we [Purina] have in writing is to protect the Purina logo."

The bankruptcy trustee's auction was conducted on January 16, 1982. McKendrick was the high bidder. He had previously qualified his bid upon the condition he be awarded a Purina dealership. His pre-condition was met before the auction took place, as McEver acknowledged that if McKendrick was the high bidder, McKendrick would receive the dealership.

Although McKendrick's bid of $120,000 was the successful bid at the bankruptcy auction, over the next several weeks the bankruptcy trustee "adjusted" the price down to $104,000.[2] During the post-bid price adjustment time period, Mr. McEver brought a standardized Dealer Identification and Trademark Contract (hereinafter referred to as "dealer contract") to Mr. McKendrick, who read and signed the agreement on or about January 28, 1982. The dealer contract expressly stated Purina's right to terminate McKendrick's dealership "at any time," and "with or without cause." On February 8, 1982, Mr. McKendrick submitted his check to the bankruptcy trustee.

After the sale, Mr. McKendrick began operating the feed store under the name of Farm and Ranch Mart. Soon after McKendrick took over the operation of the business, Royce McEver was replaced as the Purina district manager by Raymond Caraveo. McKendrick and Caraveo had several confrontations over, among other things, McKendrick's sale of non-Purina feeds at the store.

During this same time period, Mr. McKendrick met Pedro Martinez, who was in charge of the corrals at the Hipodromo, a racetrack located in Nuevo Laredo, Mexico. Mr. McKendrick testified he sold small lots of feed and pharmaceuticals to Mr. Martinez, but visited with him primarily to discuss possible large volume sales of Purina feed to the entire Hipodromo, although neither McKendrick nor the Hipodromo had permits necessary for the legal importation of such large amounts of feed from the United States. The Cattlemen's Association, located in Nuevo Laredo Mexico, did have permits to transport feed into Mexico and it did so throughout this time period. At trial, however, Mr. McKendrick stated he did not plan to go through the Cattlemen's Association to obtain the necessary legal authorization.

Allegedly, while negotiating this possible contract and discussing the problems associated with importing the feed, Mr. McKendrick began to receive returns of bad Purina horse feed from Mr. Martinez. McKendrick stated that, although he did not sell Martinez the bad feed, he exchanged it for good feed from his store in an effort to encourage future business with the Hipodromo. McKendrick further testified that Martinez blamed McKendrick for the bad feed, apparently believing the feed was sold by McKendrick, when in fact, according to McKendrick, a competitor of McKendrick's had sold the feed to Martinez. McKendrick also alleged that Caraveo, Purina's agent, had told this competitor, Nicasio Gonzalez, of McKendrick's plan to supply the Hipodromo with large amounts of Purina feed, encouraged Mr. Gonzalez to sell feed to the Hipodromo, and ruined McKendrick's reputation with Martinez and the Hipodromo. According to McKendrick, not only was his opportunity to sell large amounts of feed lost, but his small lot sales were also reduced.

■ Purina's points one and two do not challenge the finding by the jury of nondisclosure of material facts to McKendrick. Instead, Purina contends, even under

---

**2.** The record does not reflect the reason for this reduction.

McKendrick's version of the facts, it had no duty to disclose certain information to McKendrick. Specifically, each point asserts:

the trial court erred in rendering judgment for fraud based on Purina's failure to disclose to McKendrick that the Dealer Identification Agreement with Purina was terminable at will when Purina had no duty to disclose such information.

We initially note the verdict against Purina does not state Purina's fraudulent nondisclosure liability was based on Purina's failure to disclose "that the Dealer Identification Agreement with Purina was terminable at will," as stated in points one and two. Rather, in answer to question one, the jury found that "Purina knowingly failed to disclose material facts relating to" the dealer contract. Giving liberal interpretation to Purina's argument, we interpret points one and two as making an argument that the judgment against Purina based upon its failure to disclose material facts relating to the dealer contract should not have been rendered because Purina owed no legal duty to McKendrick to disclose this information. As such, this court should not evaluate specific evidence to determine whether the record contains a quantum of evidence to support the jury finding that Purina failed to disclose material facts. *See* William Powers, Jr. & Jack Ratliff, *Another Look at 'No Evidence' and 'Insufficient Evidence'*, 69 Tex.L.Rev. 515, 523 (1991). Instead, we must make, as did the trial judge, a legal determination about the substantive elements of McKendrick's fraudulent nondisclosure cause of action; that is, we must determine whether Purina had a duty to disclose material facts regarding its dealer contract to McKendrick. *See id.; see also Fisher v. Carrousel Motor Hotel, Inc.*, 424 S.W.2d 627, 629 (Tex.1967). This is entirely a question of law, to be decided by reference to statutory and case law, and it "must be determined only by the court." W. Page Keeton Et Al., Prosser and Keeton on the Law of Torts § 37, at 236 (5th ed. 1984); *cf. Palsgraf v. Long Island R. Co.*, 248 N.Y. 339, 162 N.E. 99 (1928) (not the province of the jury to decide whether manufacturer of goods was under any duty to insure safety of the ultimate consumer or whether Long Island Railroad had duty to protect Mrs. Palsgraf from fireworks explosions).

At trial, McKendrick based his theory of liability upon the Restatement (Second) of Torts which provides that one party to a business transaction is under a duty to exercise reasonable care to disclose to the other certain matters *before the transaction is consummated.* Restatement (Second) of Torts § 551(2) (1977) (emphasis added).

Purina makes at least three arguments urging this court to hold Purina had no duty to disclose material facts to McKendrick relating to its dealer contract. Alternatively, it contends, if a duty did exist, it discharged its duty of disclosure. Central to each of these arguments is Purina's assertion a binding contract was not formed until Mr. McKendrick submitted his check to the trustee. A time line of events proves helpful:

| Oral Negotiations | Auction Date | McKendrick reads and signs Dealer Contract | McKendrick sends check |
|---|---|---|---|
| 1981 | 1/16/82 | 1/28/82 | 2/08/82 |
| Representation by McEver to McKendrick | McKendrick argues contract formed here | | Purina argues contract formed here |

According to Purina, because McKendrick read and signed the agreement prior to paying the bankruptcy trustee, he could have withdrawn his bid had he not been satisfied with the representations made by Purina's agent. Although Purina cites no authority, it essentially argues that, under McKendrick's theory of disclosure liability, certain matters must be disclosed before the transaction is consummated and Purina was under no duty to disclose because full disclosure had been made before McKendrick sent his check to the trustee thereby "consummating" the auction transaction. McKendrick, also in the absence of authority, contends Purina had a duty to disclose because a binding contract was formed, not when he sent his check to the trustee, but "when the gavel fell" at the auction. McKendrick therefore argues Purina is subject to liability for its failure to disclose material facts relating to the dealer contract before the transaction became binding by McKendrick's successful bid.

Our research reveals "[a] sale by auction is complete when the auctioneer so announces by the fall of the hammer." TEX. BUS. & COM.CODE ANN. § 2.328(b) (Vernon 1968); *see also In re Bailey Pontiac Inc.,* 139 B.R. 629, 635 (N.D.Tex.1992).[3] We hold the contract binding when the auctioneer brought the gavel down at the auction.

Applying the Restatement (Second) of Torts, section 511, to this analysis, Purina is liable for any fraudulent nondisclosure made prior to McKendrick's successful bid at the auction. RESTATEMENT (SECOND OF TORTS § 551(2) (Vernon 1977). Subsequent disclosures, in this case made when Purina forwarded its dealer contract to McKendrick, and McKendrick's action in placing his check into the mail do not relieve Purina of its duty under section 511 to make reasonable disclosures "before the business

transaction was consummated" at the auction. *Id.* Although Purina's arguments are overruled to the extent that each relies upon the assertion the business transaction was consummated after the auction, we shall review the remaining contentions independent of this argument when possible.

Purina next argues it had no duty to disclose the existence of its dealer contract to McKendrick because the parties here dealt at arm's length, with their eyes open, and a complaining party must be shown to have exercised reasonable care to protect himself. To support its proposition, Purina cites cases holding a party, under no duty to volunteer information, should not be charged with the fraudulent failure to disclose in the absence of a reasonable inquiry made by the opposing party to discover such information. *Tempo Tamers, Inc. v. Crow–Houston Four, Ltd.,* 715 S.W.2d 658, 669 (Tex.App.—Dallas 1986, writ ref'd n.r.e.) (landlord had no duty to inform tenant it would enforce requirement in lease that tenant obtain written permission from landlord before erecting sign); *Richman Trusts v. Kutner,* 504 S.W.2d 539, 544 (Tex.Civ.App.—Dallas 1973, writ ref'd n.r.e.) (seller of strip shopping center had no duty to disclose facts about extent of insurance converge because buyer failed to make inquiry and discover such information); *American Marine Upholstery Co. v. Minsky,* 433 S.W.2d 717, 720 (Tex.Civ.App.—Eastland 1968, writ ref'd n.r.e.) (lessor had no duty to inform lessee of previous flooding because lessee failed to inquire about whether the creek had flooded); *Moore & Moore Drilling Co. v. White,* 345 S.W.2d 550, 555 (Tex.Civ.App.—Dallas 1961, writ ref'd n.r.e.) (silence is not fraud where party is not legally bound to volunteer information).

---

**3.** Interestingly, though not legally binding on the trial court or this court, Gary Knostman, the bankruptcy trustee, testified:

Q. (by Mr. Harwell) When no one bid more than Mr. McKendrick, and that auctioneer bought [sic] the gavel down, what choice did you have?
A. (by Mr. Knostman) I don't think I had any.

Q. (by Mr. Harwell) Was that a contract as far as you knew?
A. (by Mr. Knostman) It is my understanding, because this has come up several times in bankruptcy cases; that the Texas law, when an auctioneer rings a sale, it is a binding contract.

■ We find these cases factually distinguishable. Here, McKendrick does not contend Purina had a duty to volunteer generally the existence of its contract containing the termination clause in the absence of a reasonable inquiry. Rather, as discussed above, McKendrick bases his theory of liability upon allegations of misrepresentation. Specifically, McKendrick alleges a duty to disclose arose under section 511 of the RESTATEMENT (SECOND) OF TORTS § 551 (Vernon 1977) when, in response to McKendrick's question regarding a written contract, Purina's agent told him the dealership was "on a handshake" and there was only a written instrument "to protect the Purina logo." Unlike the cases relied on by Purina, McKendrick relies upon representations, rather than upon silence, as a basis for liability. Further, even in arms-length transactions, a duty to disclose arises if a party knows, or should have known, its prior statement was false. *Susanoil, Inc. v. Continental Oil Co.*, 519 S.W.2d 230, 236 n. 6 (Tex.Civ.App.—San Antonio 1975, writ ref'd n.r.e.).

■ Purina next argues it had no duty to disclose the existence of its written contract because there can be no fraud based upon nondisclosure in the absence of a fiduciary relationship between the parties. Purina relies upon *Crawford Painting and Drywall Co. v. J.W. Bateson Co.*, 857 F.2d 981, 985 (5th Cir.1988), *cert. denied*, 488 U.S. 1035, 109 S.Ct. 850, 102 L.Ed.2d 982 (1989). The pertinent language reads:

> the failure to disclose information is not and cannot be common law fraud in Texas in the absence of a fiduciary relationship between the parties. *See Tempo Tamers, Inc. v. Crow–Houston Four, Ltd.*, 715 S.W.2d 658, 669 (Tex.Civ. App.—Dallas 1986, writ ref'd n.r.e.).

*Id.* An examination of the only authority cited by the *Crawford* court, *Tempo Tamers, Inc. v. Crow–Houston Four, Ltd.*, 715 S.W.2d at 669, reveals:

> [a] failure to disclose information is not fraudulent unless one has an *affirmative duty to disclose* such as where a confidential or fiduciary relationship exists between the parties, or *where a party later learns that previous affirmative representations are in fact false.*

(citations omitted) (emphasis added).

Purina also relies upon *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 593–94 (Tex.1992). In *Crim Truck & Tractor Co.*, as in *Crawford Painting and Drywall Co.*, 857 F.2d at 985, a party attempted to charge its opponent with silence or nondisclosure in the absence of a fiduciary relationship. 823 S.W.2d at 592, 596. As discussed above, Mr. McKendrick does not contend Purina remained silent in the face of its duty to disclose; rather, McKendrick alleges the previous affirmative representations made by Purina's agent were false. Accordingly, we find *Crim Truck & Tractor Co.*, inapplicable.

■ Additionally, citing *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex. 1986), Purina contends no duty to disclose may arise unless "there has been a partial disclosure or where direct inquiry is made with regards to facts which the guilty party does not answer truthfully." According to Purina, under *Spoljaric*, it had no legal duty to disclose because McKendrick never asked specific questions about the terms of his dealership or whether Purina had any termination rights.

In *Spoljaric*, an employee sued his former employer for fraudulent misrepresentation arising out of the employer's oral promise to implement a bonus plan. 708 S.W.2d at 433–34. On appeal, the issue was whether there was "some evidence to support the jury's finding that the employer did not intend to implement a bonus plan at the time he promised to do so." *Id.* at 433. Contrary to Purina's analysis, *Spoljaric* did not turn upon whether a direct inquiry regarding the bonus plan had been made by the employee or whether the employer had made a partial disclosure to the employee. In fact, the employer acknowledged he promised a bonus plan would be implemented and this representation was false. *Id.* at 434. On appeal, he challenged only the legal sufficiency of the jury finding he "did not intend to keep the

promise." *Id.* We find *Spoljaric* inapplicable.

■ Purina next argues these facts do not support the trial court's finding Purina had a duty to disclose material facts relating to its dealer contract. As discussed above, The Restatement (Second) of Torts defines the circumstances, as relied upon by McKendrick, in which an affirmative duty to disclose material facts may arise:

§ 551. Liability for Nondisclosure.

(1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.

(2) One Party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,

. . . .

(b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and

(c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and

(d) the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him; and

(e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonable expect a disclosure of those facts.

RESTATEMENT (SECOND) OF TORTS § 551 (1977); *see also Smith v. National Resort Communities, Inc.*, 585 S.W.2d 655, 658 (Tex.1979). As discussed above, McKendrick contends a duty to disclose was created when Purina's agent told McKendrick the dealership was "on a handshake" and there was a written agreement only "to protect the Purina logo." According to McKendrick, such representations created a false impression and induced him to bid on the sale.

■ Before any duty may be found, there must first be proof of facts which give rise to it. Therefore, we must determine whether, under the facts in evidence, the trial court correctly ruled Purina had a duty to disclose material facts relating to the dealer contract. W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 37, at 236 (5th ed. 1984). At trial, Mr. McKendrick testified the following exchange took place between himself and Mr. McEver, Purina's agent, prior to the bankruptcy sale:

Q. (by Mr. Harwell) And, in your meetings with Royce McEver prior to the auction, did he discuss with you any specifics about what it was to be a Purina dealer, what rights were involved, what it was you actually received when you were, 'a Purina dealer.'

A. (by Mr. McKendrick) Well, one of the things we discussed, was there any type of contract, written contract, and he said no. He says that Purina's way of dealing was that they trusted their dealers, and everything was done on a handshake basis. And, I told him, I said, well, you know, is that the way it works? And, he says, yes. He says, the only thing that we have that is in writing is to protect the Purina logo. There are certain rules that we go by, and have to go by to protect that Purina logo.

We hold this evidence constitutes evidence of probative force to support a duty to disclose material facts relating to Purina's dealer contract. McKendrick plainly asked if there was any written agreement to be signed, and Purina's agent told him "no", it was to be done on a "handshake." Although the evidence shows McKendrick was aware some form of agreement would

be required to "protect the Purina logo," there is no evidence he was informed prior to the formation of the binding contract at the auction that this agreement provided the logo could be taken away "with or without cause" and "at any time" and the loss of the right to use the logo meant the termination of his prospective right to act as a Purina dealer.

 Finally, Purina asserts the trial court erred in assessing damages because the $104,000 actual damage award is excessive and results from the application of the wrong measure of damages. It is uncontested McKendrick paid $104,000 for the feedstore. Purina offered no testimony or authority to support its proposition that losses incurred during operation should be taken into consideration when awarding damages based upon Purina's failure to disclose. An appellate court is not authorized to reverse the judgment of the trial court in the absence of properly assigned error. *Prudential Ins. Co. of Am. v. J.R. Franclen, Inc.*, 710 S.W.2d 568, 569 (Tex. 1986); *Gulf Consol. Int'l, Inc. v. Murphy*, 658 S.W.2d 565, 566 (Tex.1983). A point of error not supported by argument or authorities is waived. TEX.R.APP.P. 74(f); *see also Essex Crane Rental Corp. v. Striland Constr. Co.*, 753 S.W.2d 751, 756 (Tex. App.—Dallas 1988, writ denied). "In order to preserve a complaint for appellate review, a party must have presented to the trial court a timely request, objection or motion, stating the specific grounds for the ruling he desired the court to make if the specific grounds were not apparent from the context." TEX.R.APP.P. 52(a); *see also Lemons v. EMW Mfg. Co.*, 747 S.W.2d 372, 373 (Tex.1988); *Intermarkets U.S.A., Inc. v. C-E Natco*, 749 S.W.2d 603, 606 (Tex. App.—Houston [1st Dist.] 1988, writ denied) (must bring error to trial court's attention in some manner). Accordingly, Purina has waived this argument.

We hold Purina failed to establish it had no duty to disclose material facts relating to the Dealer Identification and Trademark Contract. Points of error one and two are overruled.

 Purina's point four contends the trial court erred in awarding McKendrick prejudgment interest because he made no request for prejudgment interest in his pleadings under *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549, 554 (Tex.1985), *Benavidez v. Isles Constr. Co.*, 726 S.W.2d 23, 25 (Tex.1987) and *Vidor Walgreen Pharmacy v. Fisher*, 728 S.W.2d 353, 353 (Tex.1987). Mr. McKendrick contends that Purina's cases predate the 1987 amendment to TEX.REV.CIV.STAT.ANN. art. 5069–1.05 § 6(a) (Vernon Supp.1993), which, according to McKendrick, "requires that *all* tort judgments must include prejudgment interest". (emphasis added). We disagree. In pertinent part, section 6(a) provides "[j]udgments in wrongful death, personal injury, and property damage cases must include prejudgment interest." *Id.* Clearly, Mr. McKendrick did not bring a wrongful death or personal injury suit against Purina. Further, McKendrick does not cite authority, nor even allege, this is a property damage case. *See e.g., Benavidez v. Isles Constr. Co.*, 726 S.W.2d 23, 24 (Tex.1987) (damage to motorcycle constituted property damage); *Corley v. Exxon Pipeline Co.*, 821 S.W.2d 435, 436, 438 (Tex.App.—Houston [14th Dist.] 1991, writ denied) (damage to pipeline constituted property damage); *Panhandle & Santa Fe Ry. v. Montgomery*, 140 S.W.2d 241, 249 (Tex.Civ.App.—Amarillo 1940, no writ) (injury to cattle constituted property damage). Because this case is not a wrongful death, personal injury or property damage case which falls within the specific wording of the statute, prejudgment interest is not recoverable under the provisions of TEX. REV.CIV.STAT.ANN. art. 5069–1.05 § 6(a) (Vernon Supp.1993).[4]

4. In a true property damage situation, there is generally an undisputed date on which the injury (as opposed to who is responsible for the injury) occurred, *e.g.* vehicles collided, a pipeline exploded or cattle were destroyed. Therefore, the loss of use of the property began on that date; however, in a fraud cause of action arising out of a contractual relationship, there is no injury unless and until a trial determines a fraud occurred. The legislature simply has not addressed this distinction in TEX.REV.CIV. STAT.ANN. art. 5069–1.05 § 6(a) (Vernon Supp.

■ Additionally, since the Texas Supreme Court's decision in *Cavnar*, 696 S.W.2d at 554, prejudgment interest has been recoverable on actual damages in a tort action. However, the plaintiff must plead for prejudgment interest as an element of damages at common law. *Benavidez*, 726 S.W.2d at 25. A prayer for general relief will support prejudgment interest based on statute or contract, but not under common law tort claims. *Id.*

We find no contractual or statutory basis for an award of prejudgment interest. Mr. McKendrick recovered damages for common law fraud and tortious interference with a prospective contract, both of which are common law tort causes of action. Additionally, in *Vidor Walgreen Pharmacy*, 728 S.W.2d at 353, the supreme court specifically stated its intent regarding the pleading requirements for prejudgment interest:

[s]ubsequent to the court of appeals' opinion, this court held that "although we intended *Cavnar* to apply to all cases still in the judicial process, we did not dispense with the pleading requirement for prejudgment interest, sought at common law, nor did we suspend Rule 301, which requires the judgment to conform to the pleadings. *See* Tex.R.Civ.P. 301."

(citation omitted).

■ McKendrick next argues, to the extent that a pleading for prejudgment interest was required, Purina waived the error by failing to object before the judgment was signed on December 6, 1991. However, the record reflects Purina properly called the trial court's attention to this matter in Defendant's Motion For Entry of Judgment, And In The Alternative, Motion for New Trial and requested the court to modify its judgment accordingly, thereby preserving its point of error.

■ Finally, McKendrick argues it would have been an abuse of discretion for the trial judge to have permitted a post verdict amendment to the pleadings to allow for prejudgment interest. The Texas Supreme Court has specifically addressed this issue. In *Benavidez v. Isles Constr. Co.*, 726 S.W.2d 23, 26 (Tex.1987), the trial court refused to permit the plaintiff to file a post verdict trial amendment requesting prejudgment interest. The court stated:

[t]he recovery of prejudgment interest does not require any evidentiary proof at trial. It simply requires a mechanical application of the *Cavnar* formula by the trial court after the verdict has been returned. This being the case, Benavidez' trial amendment could not have caused any surprise or prejudice to Isles Construction Company. We hold the trial court's refusal of the amendment was arbitrary and unreasonable and therefore an abuse of discretion.

*Id.* at 26; *see also Rauscher Pierce Refsnes, Inc. v. Koenig*, 794 S.W.2d 514, 517 (Tex.App.—Corpus Christi 1990, writ denied) (holding trial court abused discretion by not allowing plaintiff to amend pretrial amendment to include prejudgment interest). Therefore, a decision by the trial to allow McKendrick to amend his pleadings to include prejudgment interest would not have constituted an abuse of discretion. For all of these reasons, point four is sustained.

■ Point of error five asserts error in the rendition of judgment for tortious interference with a potential contractual relationship because the contract was void and could not be performed. The jury found, in answer to questions four and five, there was a reasonable probability that McKendrick would have entered into a contract for the sale of feed to the Hipodromo, and Purina had intentionally and maliciously interfered with the prospective business relationship. Purina argues the trial court erred in submitting questions four and five and in awarding judgment based upon the answers thereto because the prospective contract between Mr. McKendrick and the Hipodromo was void and there can be no tortious interference with a void contract. We agree.

■ A contract to do a thing which cannot be performed without a violation of

1993). Although Mr. McKendrick may have been able to recover prejudgment interest under *Cavnar v. Quality Control Parking, Inc.*, 696

S.W.2d 549, 554 (Tex.1985), the *Cavnar* avenue is precluded as discussed elsewhere in this opinion.

law is void. *Peniche v. Aeromexico,* 580 S.W.2d 152, 156 (Tex.Civ.App.—Houston [1st Dist.] 1979, no writ). A contract made "with a view of violating the laws of another country, though not otherwise obnoxious to the laws either of the forum or of the place where the contract is made," is illegal and "will not be enforced." *San Benito Bank & Trust Co. v. Rio Grande Music Co.,* 686 S.W.2d 635, 638 (Tex.App.—Corpus Christi 1984, writ ref'd n.r.e.). If a prospective contract is unenforceable because it is void, the unenforceability of the contract provides a defense for tortious interference claims. *Juliette Fowler Homes, Inc. v. Welch Assocs., Inc.,* 793 S.W.2d 660, 664 (Tex.1990); *Exxon Corp. v. Allsup,* 808 S.W.2d 648, 654–55 (Tex. App.—Corpus Christi 1991, writ denied); *see also Travel Masters, Inc. v. Star Tours, Inc.,* 827 S.W.2d 830, 833 (Tex.1991).

■ Regarding the tortious interference allegations, the record reflects:

Q. [by Mr. Ylatilo] Again, back in December of 1984, you discussed the reasons that you weren't able to sell any feed to the racetrack in Nuevo Laredo; is the Hipodromo?

A. [by Mr. McKendrick] The Hipodromo, yes.

. . . .

Q. And, wasn't the single most important reason that feed from the United States was not being sold to the racetrack was because the permits and the situation in Mexico had changed, and you were not able to sell large amounts of feed into Mexico at that particular time?

. . . .

Q. You couldn't do it with any product because you couldn't (sic) get the feed into Mexico legally, could you?

A. No. At the time we were trying to sell, we could not get the feed in legally.

Undisputedly, neither McKendrick nor the Hipodromo had the permits required to import large amounts of feed into Mexico. Without the proper permits, there could be no contract or prospective contract between McKendrick and the Hipodromo. The only opportunity supported by any evidence is the prospective sales of horse feed, but Mr. McKendrick specifically stated these sales were not possible until the permits were obtained. As such, there was no reasonable probability such a contractual or business relationship would have developed were it not for Purina's interference. *Exxon Corp.,* 808 S.W.2d at 659. Such a prospective contract cannot provide the subject of an interference claim.

■ Mr. McKendrick also contends the tortious interference award is proper because the contract could have been performed legally through the conduit of the Cattlemen's Association. On cross-examination, however, McKendrick testified:

A. [W]e could not get the feed in legally. What we were working on was trying to get the feed in legally, but *we were not going [to] go through the Cattlemen's Association....* (emphasis added)

Thus, McKendrick's own words preclude the tortious interference recovery. Point five is sustained. Purina also presents other reasons the trial court erred in rendering judgment for tortious interference in points three, six and seven. Because we sustain point five, we need not address these arguments.

Accordingly, the judgment of the trial court awarding $104,000 actual damages and $60,000 exemplary damages to Mr. McKendrick on the basis of Purina's failure to disclose material facts relating to the Dealer Identification and Trademark Contract to McKendrick prior to the bankruptcy auction sale is affirmed. The judgment of the trial court awarding prejudgment interest on the failure to disclose award is reversed and the judgment is modified, deleting the award of prejudgment interest. The judgment of the trial court awarding $40,000 actual damages and $125,000 exemplary damages for tortious interference with a prospective contract is reversed and judgment is rendered Mr. McKendrick take nothing on his tortious interference claim against Purina. Costs of this appeal are assessed equally against the parties.