NUMBER 13-03-048-CV

 

                         COURT
OF APPEALS

 

               THIRTEENTH
DISTRICT OF TEXAS

 

                  CORPUS
CHRISTI - EDINBURG

___________________________________________________________________

 

PLAYBOY ENTERPRISES, INC.,                                   Appellant,

 

                                           v.

 

EDITORIAL CABALLERO, S.A. DE
C.V., ET AL.,            Appellees.

___________________________________________________________________

 

                  On
appeal from the 332nd District Court

                           of Hidalgo County, Texas.

___________________________________________________  _______________

 

                              O
P I N I O N

 

       Before
Chief Justice Valdez and Justices Hinojosa and Rodriguez 

                                Opinion
by Justice Rodriguez

 








This commercial dispute arose between plaintiff Eduardo Gongora,[1]
appellant Playboy Enterprises, Inc. (PEI), and appellees Editorial Caballero,
S.A. de C.V. (EC) and Grupo Siete International, Inc. (GSI).  EC and GSI cross-claimed against PEI for
fraud, breach of contract, breach of fiduciary duty, business disparagement,
tortious interference, and interference with prospective business
relations.  PEI cross-claimed against EC
and GSI alleging, among other things, breach of contract and fraud.  Immediately before closing arguments and over
PEI's objection, the trial court realigned EC and GSI as plaintiffs.  The jury found for EC and GSI and against PEI
on all claims, except interference with prospective business relations, and
awarded $3,600,000 for out-of-pocket expenses, $500,000 for liabilities
incurred, and $260,000 for lost profits. 
The jury declined to award punitive damages.  With respect to PEI's claims, the jury found
that both EC and GSI had committed fraud and various contractual breaches, but
that their actions were excused.[2]  The trial court rendered a final judgment for
damages awarded by the jury in the amount of $4,360,000, plus the maximum
allowable pre-judgment interest calculated from the date suit was filed and
post-judgment interest at the maximum rate allowed by law.








PEI appeals from
the judgment entered in favor of EC and GSI on their claims against PEI.  By ten issues and sub-issues, PEI brings
legal and factual sufficiency challenges related to the jury's liability and
damage findings, and contends that the trial court erred in (1) realigning EC
and GSI as plaintiffs, (2) failing to properly charge the jury on wrongful
disparagement,
and (3) refusing to send a requested exhibit to the jury room during
deliberations.  PEI asks this Court to
reform the judgment, if affirmed, with respect to pre-judgment and
post-judgment interest rates.  By a single issue with sub-issues, PEI also appeals
from the judgment entered against PEI on its breach of contract cross-claim because EC and GSI
failed to make payments owed under the International Publishing License
Agreement (the License Agreement) and under the Renegotiated Payment Plan.  We reverse and render, in part, and remand,
in part.

I.  BACKGROUND








For many years, pursuant to predecessor agreements between EC and PEI,
EC published and distributed a Spanish language version of Playboy
magazine in Mexico.[3]  In October 1996, PEI and EC entered into the
License Agreement at issue in this case. 
It provided that EC would continue to publish and distribute the
magazine in Mexico.  It also provided that
EC, with PEI's prior written approval, could publish a Spanish language version
of Playboy for distribution in the United States and could assign the
United States distribution rights to, and only to, GSI.[4]  The License Agreement was for a three-year
term beginning January 1, 1997.  The
October 1997 issue was the first issue of the Spanish language edition of Playboy
distributed in the United States pursuant to the License Agreement.  PEI terminated the License Agreement in
January 1998 for EC's non-payment of royalties and other payments owed.  Before termination of the License Agreement,
the parties had renegotiated payments and entered into a written Renegotiated
Payment Plan.

II.  Fraud

By its second issue, PEI contends that EC and GSI cannot recover for
fraud as a matter of law.  Alternatively,
it complains that the evidence is insufficient to support the finding.

The jury answered, "Yes," when asked, "Did [PEI] commit
fraud against [EC] or [GSI], or both, proximately causing damages?"  The jury was instructed, in part, as follows:

Fraud occurs when----

 

a.       a party makes a material
misrepresentation,

 

b.       the
misrepresentation is made with knowledge of its falsity or made recklessly
without any knowledge of the truth and as a positive assertion,

 

c.       the misrepresentation is made with the
intention that it should be        acted
on by the other party, and

 

d.       the
other party acted in reliance on the misrepresentation and thereby suffers
injury.

 

A.  Oral Representations

 








PEI contends that EC and GSI cannot, as a matter of law, recover for
fraud based on PEI's alleged oral representations because the License Agreement
specifically bars EC and GSI from relying on oral representations.  The alleged oral representations at issue in
this case include the following:  (1) PEI
would not enforce or terminate the License Agreement; (2) renewal was automatic;
(3) EC and GSI could import the Spanish language edition into the United
States; (4) PEI intended to ramp up circulation after the initial three-year
term of the License Agreement and was not concerned with
"cannibalization;"[5]
(5) it was not going to be a problem to distribute or sell 150,000 copies per
month; and (6) the parties would be partners. 

In this regard,
[however,] a party to an arm's length transaction must exercise ordinary care
and reasonable diligence for the protection of his own interests, and a failure
to do so is not excused by mere confidence in the honesty and integrity of the
other party.  Therefore, reliance upon an
oral representation that is directly contradicted by the express, unambiguous
terms of a written agreement between the parties is not justified as a matter
of law.

 

DRC
Parts & Accessories, L.L.C. v. VM Motori, S.P.A., 112 S.W.3d 854, 858
(Tex. App.BHouston [14th Dist.]
2003, pet. denied) (en banc) (op. on reh'g).

The License Agreement, in this case, specifically provided for the
following:

1.       Upon the occurrence of an event of
default, the non-defaulting party may terminate the License by written notice
to the party in default;

 

2.       On the condition that Licensee shall be
in full compliance with the material terms of this Agreement, including the
timely payment of all amounts required under this Agreement, then Licensee
shall have the option . . . to request negotiations concerning an extension of
the license;

 

3.       Distribution and sale of the Foreign
Edition in any country other than Mexico will be subject to Licensor's prior
written approval, which may be withdrawn once given, on notice from Licensor;

 

4.       If Licensor fails or declines to grant
such consent or approval to Licensee, Licensor shall not be liable to give any
reason therefor;

 








5.       Licensor's approval of such distribution
and sale in the United States, if at all, will not occur until at least six (6)
months following the legal formation of the joint venture Grupo Siete
International, Inc., and if such approval is granted, will not exceed
one-hundred-fifty thousand (150,000) copies per issue; and

 

6.       The rights and powers herein granted to
Licensee are those of a licensee only and this Agreement shall not, and is not
intended to, create any other relationship nor make, constitute or appoint
Licensee an agent or employee of Licensor.

 

The
alleged oral representations about which EC and GSI complain are directly
contradicted by the express, unambiguous terms of the License Agreement, and EC
and GSI are not justified in relying upon them as a matter of law.  See id.  Thus, the fraud claim based on these oral
representations is barred on this basis.








The License Agreement also contains a merger clause that specifically
sets out that "this Agreement represents the entire understanding of the
parties.  None of the terms of this
Agreement can be waived or modified except by an express agreement in writing
signed by the parties.  There are no
representations, promises, warranties, covenants or undertakings other than
those contained in this Agreement." 
Where a contract is negotiated at arms-length by sophisticated
businessmen represented by counsel, this type of "merger" clause,
like the clause in Schlumberger Tech. Corp. v. Swanson, 959
S.W.2d 171, 180-81 (Tex. 1997), is enforceable and negates reliance on
any alleged oral representations, an essential element of fraud as set out in
the charge above.  See id.
(providing that merger clauses could, in some cases, operate to negate the
reliance element of fraudulent‑inducement claims arising from the same
contract containing the merger clause); see also IKON Office Solutions, Inc.
v. Eifert, 125 S.W.3d 113, 126-28 (Tex. App.BHouston [14th Dist.] 2003, pet. denied)
(providing that provisions that contract was "entire agreement" and
requiring any modifications to be in writing barred fraudulent‑inducement
claim under Schlumberger).  Here,
as in Schlumberger, the alleged oral representations dealt with matters
specific to PEI's rights under the License Agreement.  Therefore, reliance by EC and GSI on the
purported oral representations is negated as a matter of law on this basis.

B.  Media Kit

PEI also asserts that EC and GSI cannot rely on the asserted approval
of the "media kit" as a representation that EC and GSI could
distribute 225,000 copies monthly in the United States.  GSI prepared the media kit to promote the
planned U.S. launch of the magazine.  The
kit set out expected monthly U.S. distribution at 225,000 copies, with expected
sales of 125,000 copies.  However, the
License Agreement, which required formal, written approval for any U.S.
distribution, provided that, if approval was granted, such distribution and
sale in the United States would not exceed 150,000 copies per issue.  The number set out in the media kit exceeded
150,000, and PEI approval, if any, of a media kit was not the formal written
approval for U.S. distribution required by the License Agreement.  Therefore, because the alleged approval of the
media kit and representations set out in the media kit dealt with matters
specific to PEI's rights under the License Agreement, reliance by EC and GSI on
these representations was also negated as a matter of law.  See Schlumberger, 959 S.W.2d at
180-81; DRC, 112 S.W.3d at 858; see also Airborne Freight Corp. v.
C.R. Lee Enter., 847 S.W.2d 289, 297-98 (Tex. App.BEl Paso 1992, writ
denied).








C.  Fraudulent Concealment

The
jury was also instructed, in part, as follows:

 

Fraud may also occur
when----

 

a.       a
party conceals or fails to disclose a material fact within the knowledge of
that party,

 

b.       a
party knows that the other party is ignorant of the fact and does not have an
equal opportunity to discover the truth,

 

c.       a
party intends to induce the other party to take some action by concealing or
failing to disclose the fact, and

 

d.       the
other party suffers injury as a result of acting without knowledge of the
undisclosed fact.

 

1.  Duty

 

PEI contends that fraudulent concealment cannot be based on PEI's
alleged failure to disclose the concerns of Hugh Hefner, founder of Playboy,
chairman emeritus, editor-in-chief, and owner of approximately seventy percent
of the stock, about distributing a second-language version of Playboy in
the United States, because it owed no such duty.  PEI asserts it had no duty to disclose these
concerns because it had no special relationship of trust and confidence with EC
and GSI in this arms-length commercial transaction.













"As a general rule, a failure to disclose information does not
constitute fraud unless there is a duty to disclose the information."  Bradford v. Vento, 48 S.W.3d 749, 756
(Tex. 2001) (quoting Ins. Co. of N. Am. v. Morris, 981 S.W.2d 667, 674
(Tex. 1998)); see Ralston Purina Co. v. McKendrick, 850 S.W.2d 629, 633‑36
(Tex. App.BSan Antonio 1993, writ
denied).  Such a duty can arise where
there is a formal fiduciary relationship. 
See Morris, 981 S.W.2d at 674 (providing that
"[f]iduciary duties arise as a matter of law in certain formal
relationships, including attorney-client, partnership, and trustee
relationships").  Such a duty
can also arise where there is a confidential relationship between the parties.  Id. (providing that "confidential
relationships may arise when the parties have dealt with each other in such a
manner for a long period of time that one party is justified in expecting the
other to act in its best interest"). 
However, the existence of a fiduciary or confidential relationship is
but one of the bases for imposing a duty to disclose information.  See Formosa Plastics Corp. v. Presidio
Engineers & Contractors, Inc., 941 S.W.2d 138, 146‑47 (Tex. App.BCorpus Christi, 1995)
(per curiam), rev'd on other grounds, 960 S.W.2d 41, 44 (Tex.
1998).  In addition to situations where
there is a fiduciary or confidential relationship, as this Court set out in Formosa
Plastics, a duty to speak may arise in an arms-length transaction in at
least three other situations:  (1) when
one voluntarily discloses information, he has a duty to disclose the whole
truth; (2) when one makes a representation, he has a duty to disclose new information
when the new information makes the earlier representation misleading or untrue;
and (3) when one makes a partial disclosure and conveys a false impression, he
has the duty to speak.  Id.; Hoggett
v. Brown, 971 S.W.2d 472, 487 (Tex. App.BHouston [14th Dist.] 1997, pet. denied); Ralston
Purina, 850 S.W.2d at 635-36.[6]
"Whether such a duty exists is a question of law."  Bradford, 48 S.W.2d at 755; see Hoggett,
971 S.W.2d at 487.

The evidence in this case establishes that as early as the fall of
1996, PEI, EC, and GSI knew of Hefner's concerns regarding the distribution of
a Spanish language edition of Playboy. 
It is undisputed that before the License Agreement was signed in
November 1996 and became effective in January 1997, PEI disclosed general
information to EC and GSI regarding concerns it had about cannibalism and the
publication of the Spanish language edition for distribution in the United
States.  For example, on October 17,
1996, Robert O'Donnell, a member of the board of directors, vice-president of
the international publishing group, and business manager for PEI, wrote a memo
to Henry Marks, a senior vice-president of the international publishing group
and a member of the board of directors at PEI, which reads, in part, as
follows: 

I just finished a
coffee with [EC and GSI principals,] Javier [Sanchez Campuzano (Sanchez)] and
Paul [Siegel], and while feathers are still a bit ruffled, especially Javier's,
they're going to sign the deal as written. . . .

 

I was very clear to both of them that while I anticipated few problems
or issues re:  the other Spanish markets,
that we should all prepare ourselves for the microscope, including, perhaps
even "inputs" from Hef, for entering the USA.








Additionally,
O'Donnell testified that PEI disclosed to EC and GSI that Hefner was upset and
that cannibalization needed to be disproved.[7]  Fernando Becerra Paramo, GSI's
editor-in-chief, also testified that he was aware of PEI's cannibalization
concerns.

While there is evidence that PEI disclosed general concerns, the
evidence also establishes that material facts regarding Hefner's position on
cannibalization and his instructions regarding the publication of the Spanish
language edition for distribution in the United States were not disclosed to EC
and GSI.  Early internal memos at PEI set
out that what was being done was "quite contrary to how Hef envisioned
this publication."  In November
1996, after the License Agreement was signed, Christie Hefner, chairman of the
board of directors, chief executive officer, and Hefner's daughter, wrote a
memo to Marks and Bob Perkins setting out, in part, the following:








My agreement to allow
the export of the Mexican edition subject to creative and business parameters
was not an agreement to allow quasi American and Mexican Spanish language
editions.  When Bob starts talking about
U.S. drawings in the book, U.S. pictorials, U.S. interview subjects, we are now
clearly crossing the line into a Spanish language edition of Playboy for the
U.S. market competing with U.S. Playboy, which is not something that I approved
and I think is directly contrary to concerns that Hef expressed when we were
looking at this as a stand-alone deal.

 

In
December 1996, Hefner wrote the following internal memo:

With the acquisition
of the Mexican Playboy by a U.S. firm, it is important to make clear that the
editorial focus and distribution of this Spanish language version of the
magazine remain essentially Mexican.  

 

As previously
expressed, I don't want a second language version of Playboy competing with us
here in the U.S.

 

Again,
in February 1997, after the License Agreement became effective, Hefner wrote
internal memos expressing his position and dissatisfaction with the
project.  On February 4, 1997, he sent
the following Playboy interoffice memo to Marks:

There still seems to
be real confusion on what is acceptable and not acceptable related to the
distribution of a Spanish language edition (Mexican or other) in the United
States. 

 

I have no problem with
a direct Spanish translation of the U.S. magazine if we own it and can count
the circulation toward our own rate base. 
But I have already rejected the idea of a separate Spanish language
edition of PLAYBOY in the U.S. as being too confusing.  And I am even more opposed to allowing some
outside company [to] own and distribute a Spanish edition (Mexican or not) here
in the U.S.

 

The direct competition of a Spanish edition in the U.S. with a
circulation of 130,000 to 150,000, as suggested in your memo, would clearly
hurt the newsstand circulation and advertising rate base of the U.S. magazine
and that impactBwhether it costs us
5,000 copies or 50,000Bmakes no sense at a
time when we are fighting a reduction in newsstand outlets and sales.








On
February 7, 1997, Hefner sent the following memo to Christie:

I think it is naive to
assume that distributing 100,000 copies of a Mexican edition in the United
States won't have some impact on the newsstand sales of the U.S. edition when
our own single copy sales are often no more than 500,000.

 

With much of the
celebrity pictorial and centerfold content the same in each issue, I'm
concerned about the impact this will have on our rate base.

 

Even the loss of 5,000
or 10,000 copies a month will hurt us, but we'll never know, because there is
really no way of monitoring the impact of this inappropriate competition.

 

I think this is a dumb
decision done by people who do not understand the fuller implications of what
they are doing.

 

This is being done
despite my specific instructions to the contrary.

 

Throughout the year, memos continued to express the fact that
"Hef is very concerned about the issue of cannibalization."  For example, by internal memo in July 1997,
Dick Rosenzweig, chief financial officer and Hefner's right-hand man and
contact with the operations of the company, wrote the following memo to Christie,
which reads in part:

Hef had and continues
to have major reservations about how this project will negatively impact the
circulation and advertising of [PEI's] domestic edition with very little
additional revenue from the importation of this edition to us.  Others and I have had many conversations with
Henry Marks and Bob O'Donnell about this move and have asked for a definitive
memo for Hef to review prior to moving ahead. 
I never received this memo.

 

When distribution
numbers of 50,000 to 100,000 copies were originally mentioned Hef was
enraged.  He has no problem with a few
thousand of these copies brought into the country just as we do with other
foreign editions on foreign newsstands. . . .

 








I notice on our
current Calendar of Events we have three launch parties slated beginning in
late August in Miami, New York and Los Angeles. 
I find it difficult to believe we're going to this trouble to launch a
few thousand magazines.  Hef continues to
be adamant on this point and has dropped it back squarely in our laps.

 

He indicated he does not have a problem with our doing a direct
Spanish translation of the domestic edition (which I understand has no appeal
to the Hispanic market in this country) or he would consider a custom Spanish
language edition if it were our project.

On
August 21, 1997, Christie wrote to Rosenzweig regarding the test entry of the
Spanish language version of Playboy into the United States.  In her memo, she stated the following, in
part:

Hef is still having
great difficulty on making the decision to move ahead with the Mexican edition
distribution in the U.S.  He is concerned
that the domestic circulation base continues to decline, we continue to lose
outlets and despite Larry's memo of August 20th he worries about the domestic
circulation.

 

He also worries about
the quality of this magazine distributed in the U.S. and the amount of time it
will take away from more important projects for some of our key people.  Indeed, what it really gets down to for him
are the economicsBis it really worth
doing?  As he said, if this meant another
two million dollars added to our bottom line it's one thing, but to do this
with all of his concerns for little profit is not worth the experiment.

 








Finally, at trial, John McDonald, PEI's corporate representative,
testified that while there was no confusion about Hefner not wanting a
second-language version of Playboy competing with Playboy in the United States,
because Hefner was not involved in the day-to-day operations of the company, it
was a matter of Christie getting him to listen to reason and of PEI to prove
that he was wrong.  Additionally, at
trial, O'Donnell testified that early in the project when the major strategy
change from a "front door" to a "side door" approach was
first presented to Christie she said okay, but she had to check with Hefner
because that was his backyard.

Based on these facts, we conclude this evidence supports the
imposition of a duty on PEI to disclose to EC and GSI material facts regarding
Hefner's specific concerns about cannibalization and his instructions regarding
the publication of the Spanish language edition for U.S. distribution.  Without disclosing Hefner's position on these
matters, the information relayed to EC and GSI regarding general concerns PEI
had about cannibalism and the publication of the Spanish language edition for
distribution in the United States was not the whole truth, was misleading, or
conveyed a false impression.  Thus,
PEI's duty to disclose the material facts arose in at least one, if not all, of
the following situations:  when one
voluntarily discloses information, he has a duty to disclose the whole truth;
when one makes a representation, he has a duty to disclose new information when
the new information makes the earlier representation misleading or untrue; and
when one makes a partial disclosure and conveys a false impression, he has the
duty to speak.  See Hoggett, 971
S.W.2d at 487 (citing Formosa Plastics, 941 S.W.2d at 146‑47).

2.  Sufficiency of the Evidence








Having determined that PEI owed EC and GSI the asserted duty to
disclose information, we look next at PEI's contention that the evidence is
legally and factually insufficient to establish that EC and GSI were ignorant
of the undisclosed facts, an element of fraudulent concealment set out in the
jury charge.  See Romero v. KPH
Consol., Inc., 166 S.W.3d 212, 221 (Tex. 2005); Wal‑Mart Stores,
Inc. v. Sturges, 52 S.W.3d 711, 715 (Tex. 2001) (providing that an
assessment of the evidence "must be made in light of the jury charge that
the district court gave without objection").

In reviewing the legal sufficiency of the evidence, we view the
evidence in the light favorable to the verdict, crediting favorable evidence if
reasonable jurors could, and disregarding contrary evidence unless reasonable
jurors could not.  City of Keller v.
Wilson, 168 S.W.3d 802, 807 (Tex. 2005). 
In conducting a legal sufficiency review, we will sustain a legal
sufficiency point if the record reveals the following:  (a) the complete absence of a vital fact; (b)
the court is barred by rules of law or of evidence from giving weight to the
only evidence offered to prove a vital fact; (c) the evidence offered to prove
a vital fact is no more than a mere scintilla; or (d) the evidence establishes
conclusively the opposite of the vital fact. 
Id. at 810 (citing Robert W. Calvert, "No Evidence"
& "Insufficient Evidence" Points of Error, 38 Tex. L. Rev. 361, 362‑63
(1960)).  The fact finder is the sole
judge of the credibility of the witnesses and the weight to give their
testimony.  See id. at 819.

When reviewing factual insufficiency complaints, this Court considers,
weighs, and examines all evidence which supports or undermines the
finding.  Golden Eagle Archery v.
Jackson, 116 S.W.3d 757, 761 (Tex. 2003). 
The finding is set aside only if the evidence standing alone is too weak
to support the finding or the finding is so against the overwhelming weight of
the evidence as to be manifestly unjust and clearly wrong.  Id.








Jonathan Fink, GSI's corporate representative, testified that EC and
GSI knew cannibalization was a concern to PEI, but only to the extent EC and
GSI were "limited to selling 150,000 copies."  He did not know there were concerns in December
1996 or that in 1997 Hefner was adamantly opposed to the activity in which PEI,
EC, and GSI were involved.  Fink
testified that they were not told that Hefner did not want a second-language
edition for fear it would cannibalize the U.S. Playboy.  O'Donnell did not tell Fink of the substance
of Hefner's February memos; he did not tell him that if there was any
cannibalization it would kill the deal. 
Fink testified that before the expected Cinco de Mayo launch, Playboy's
representatives were very upbeat and excited about the launch and were helpful
in every way.  Fink testified that, even
with limited distribution in September, October, and November 1997, they were
still being told "everyone, be calm, let's work together, we'll work this
out, it's not a problem, we'll go forward, we'll do more in the future."








As set out above, the evidence, including the evidence supporting a
conclusion of duty to disclose, reveals that PEI only generally informed EC and
GSI of Hefner's concerns.  While
representing that cannibalism was an issue, the evidence establishes that PEI
did not disclose to EC and GSI that Hefner was adamant about not allowing
cannibalization of the U.S. edition and that he had instructed PEI executives
not to publish the Spanish language edition of Playboy (Mexican or
other) unless the Spanish language edition was owned one hundred percent by PEI
and the Spanish language edition was an exact translation of the U.S. Playboy.  The evidence provides more than a scintilla
of evidence to establish that EC and GSI were ignorant of the undisclosed
facts.  See City of Keller,
168 S.W.3d at 810.  Thus, reviewing the
evidence in the light most favorable to the verdict and disregarding all
contrary evidence that a reasonable jury could have disbelieved, we conclude
the evidence is legally sufficient to support the jury's fraud finding.  See id. at 807.

Moreover, considering, weighing, and examining all evidence which
supports or undermines the finding, we conclude the evidence standing alone is
not too weak to support the finding or the finding is not so against the
overwhelming weight of the evidence as to be manifestly unjust and clearly
wrong.  See Golden Eagle
Archery, 116 S.W.3d at 761.  Thus, we
conclude that there is factually sufficient evidence to support this element of
fraudulent concealment.

Having concluded that PEI had a duty to disclose and that the evidence
supports the jury's finding, EC and GSI can recover for fraud on this
basis.  PEI's second issue is overruled.

III.  Tortious Interference with
Existing Contractual Relationships








In issue three, PEI argues that there is no evidence that it
interfered with any contracts between EC and GSI and third parties.  We agree. 
"A tortious interference cause of action is established if the
plaintiff proves:  (1) the existence of a
contract subject to interference; (2) a willful and intentional act of
interference; (3) the act was a proximate cause of the plaintiff's damages; and
(4) actual damage or loss resulted." 
Friendswood Dev. Co. v. McDade + Co., 926 S.W.2d 280, 282 (Tex.
1996).  In this case, we find no
evidence, and EC and GSI refer us to none, that supports a finding that PEI
interfered with contracts between EC and GSI and third parties.  Although EC and GSI assert that PEI's alleged
approval of the distribution numbers in the media kit "interfered with
[their] business relations with investors, advertiser, and others," they
do not identify any such contracts, and we find no record of such contracts
being presented at trial.

EC and GSI also assert that there is evidence to support this finding
because PEI allegedly interfered with the contracts between EC and GSI.  They rely on Sanchez's testimony that PEI's
Henry Marks encouraged Sanchez and EC to end the relationship with GSI.  Regardless of whether such testimony could
otherwise constitute evidence of interference, Sanchez refused to end the
relationship.  Thus, no breach was
induced and no damages caused.

There is no evidence offered in this case to prove that PEI interfered
with any contracts between EC and GSI and third parties, or between EC and
GSI.  Thus, the evidence is legally
insufficient to support the jury's finding of tortious interference.  See City of Keller, 168 S.W.3d at
810.  We sustain PEI's third issue.

IV.  Fiduciary Duty








By its fourth issue, PEI contends that EC and GSI cannot recover for
breach of fiduciary duty based on a joint enterprise or on a relationship of
trust and confidence.  The License
Agreement expressly provided that the only relationship between PEI and EC was
that of licensor-licensee; no other relationship was created by the License
Agreement.  Cf. Esquivel v.
Murray Guard, Inc., 992 S.W.2d 536, 541 (Tex. App.BHouston [14th Dist.]
1999, pet. denied) (holding that the express terms of the contract precluded a
finding of joint enterprise).  Therefore,
in this case, a joint enterprise or a confidential relationship must have been
established outside of the License Agreement.

A.  Joint Enterprise

The jury found that PEI engaged in a joint enterprise with EC, GSI, or
both.  The charge instructed the jury as
follows:

A joint enterprise
exists if the persons concerned have: 
(1) an agreement, express or implied, among the members of the group;
(2) a common purpose to be carried out by the group; (3) a community of
pecuniary interest in that purpose, among the members; and (4) an equal right
to a voice in the direction of the enterprise, which gives an equal right of
control.

 








There
is no evidence, however, establishing that an agreement, express or implied,
existed outside the License Agreement. 
Moreover, even assuming the License Agreement provided the basis for
EC's and GSI's position, a joint enterprise cannot exist as a matter of law
between a licensee who has a pecuniary interest in profits and a licensor who
has a pecuniary interest only in royalties since the necessary community of
pecuniary interest in a common purpose is lacking.  See St. Joseph Hosp. v. Wolff, 94
S.W.3d 513, 527-28 (Tex. 2002) ("Although the [franchisors] stand to
benefit financially from the successful downstream marketing of their goods or
services, their interests in those activities are not held in
"community" with the [franchisees] because they are not shared
"without special or distinguishing characteristics.").[8]  Here, PEI's compensation under the License
Agreement was solely in the form of royalties, precluding any finding of joint
enterprise.  Thus, we conclude the
evidence is legally and factually insufficient to establish a joint enterprise
imposing a fiduciary duty on PEI.

B.  Relationship of Trust and
Confidence

 The jury also found that a
relationship of trust and confidence existed between PEI and EC or GSI or
both.  The jury was instructed as follows:

A relationship of
trust and confidence existed if [EC or GSI] justifiably placed trust and
confidence in [PEI] to act in the best interests of [EC or GSI].  [EC's or GSI's] subjective trust and feelings
alone do not justify transforming arm's-length dealings into a relationship of
trust and confidence.

 








There
is, however, no evidence of such a relationship.  Sanchez testified that he "trusted"
PEI and that their business dealings were always conducted "in the most
friendly manner."  Fink similarly
testified that he trusted PEI and that "everyone was great
friends."  But subjective trust does
not transform arms-length dealings into a fiduciary relationship.  Schlumberger, 959 S.W.2d at 177; see
Garrison Contractors, Inc. v. Liberty Mut. Ins. Co., 927 S.W.2d 296, 301
(Tex. App.BEl Paso 1996), aff'd,
966 S.W.2d 482 (Tex. 1998) (providing that allegations that the defendant had
promised to "take care of," "look out for," and was
"working for" the plaintiff were insufficient as a matter of law to
establish a relationship of trust and confidence).  The testimony in this case establishes that
the parties had, at most, a friendly working relationship.  The License Agreement did not create a
relationship of trust and confidence, and there were no other circumstances
creating any such special relationship between PEI and EC and/or GSI.  See Trans. Inc. Co. v. Faircloth, 898
S.W.2d 269, 280 (Tex. 1996) ("A fiduciary or confidential relationship may
arise from circumstances of the particular case, but it must exist prior to,
and apart from, the agreement made the basis of the suit.").  Although Sanchez had an ongoing business
relationship with PEI, this, also, is insufficient as a matter of law.  See Crim Truck & Tractor Co. v.
Navistar Int'l Transp. Corp., 823 S.W.2d 591, 595 (Tex. 1992)
("Neither is the fact that the relationship has been a cordial one, of
long duration, evidence of a confidential relationship.").  Accordingly, we conclude the evidence is
legally and factually insufficient to establish that a relationship of trust
and confidence existed between PEI and EC or GSI or both.

C.  Partnership








EC and GSI also argue that they pleaded that they were in a
partnership with PEI, that PEI did not file a verified denial, and that under
Texas Rule of Civil Procedure 93(5) a partnership was created by default; thus,
it created a fiduciary relationship.  See
Tex. R. Civ. P. 93(5).  However, rule 93 does not apply here.  From pleadings filed by EC and GSI, it is
clear they are asserting a special relationship of trust or confidence or a
joint enterprise, not a true partnership, even though the language in the
pleading asserts that they were in a "joint venture, joint enterprise, or
partnership" with PEI.  A
partnership requires an agreement to share profits.  Schlumberger, 959 S.W.2d at 176.  However, their pleadings acknowledge that PEI
was to receive "royalties arising from the business activities of
Editorial and Grupo Siete," not profits. 
The License Agreement referenced in the pleadings also makes clear that
PEI was entitled to royalties, not profits. 
Moreover, EC and GSI requested jury questions on special relationship
and joint enterprise, not partnership. 
Where the pleadings as a whole reflect that a partyBwhile using the term
"partnership"Bis in fact asserting a
different relationship not covered by the rule, that rule does not apply.  See Zarsky Lumber Co. v. Guiberteau,
270 S.W.2d 630, 632 (Tex. Civ. App.BSan Antonio 1954, writ
ref'd n.r.e.) ("[I]n view of all the facts plead[ed] herein, [the
allegation] is one of joint adventure and not of partnership, and allegations
of joint adventure do not have to be denied under oath."); see also
Cantu v. Holiday Inns, Inc., 910 S.W.2d 113, 116-17 (Tex. App.BCorpus Christi 1995,
writ denied) (providing that pursuant to the "of record" exception in
rule 93, a matter established by evidence in the trial court record appears
"of record," so no verified denial is needed).  Because joint enterprise and special trust
relationships are not covered by rule 93, this rule does not apply, and the
argument fails.

Having determined that there is no evidence to establish that a joint
enterprise or a relationship of trust and confidence existed between PEI and EC
or GSI or both, we conclude EC and GSI cannot recover for breach of fiduciary
duty based on such  relationships.  We sustain PEI's fourth issue.

V.  Wrongful Disparagement








By its fifth issue, PEI contends that there is no evidence of wrongful
disparagement.  "The general
elements of a claim for business disparagement are publication by the defendant
of the disparaging words, falsity, malice, lack of privilege, and special
damages."  Hurlbut v. Gulf Atl.
Life Ins. Co., 749 S.W.2d 762, 766 (Tex. 1987).  The jury found for EC and GSI on this claim
and awarded damages in the amount of $260,000 for lost profits in Mexico, $0 in
the United States, and $0 in Latin America.

To support this wrongful disparagement claim, EC and GSI rely on the
information in the media kit prepared by GSI and allegedly approved by
PEI.  EC and GSI argue that, through the
media kit, PEI published false statements to third parties; false statements
that damaged their business.  The media
kit, however, contained only inflated circulation numbers for the United
States, not Mexico circulation numbers. 
The media kit did not address business in Mexico, which is the only
market for which the jury found lost profits. 
The media kit related only to distribution in the United States, and the
jury found no lost U.S. profits.[9]  Representations in the media kit cannot,
therefore, support disparagement damages in the form of lost profits in
Mexico.  We conclude, therefore, that
there is no evidence offered in this case to prove this vital fact, and the
evidence is, thus, legally insufficient to support the jury's finding of wrongful
disparagement.  See City of Keller,
168 S.W.3d at 810.  PEI's fifth issue is
sustained.

VI.  Damages

The jury awarded EC and GSI $3,600,000 for out-of-pocket expenses,
$500,000 for liabilities incurred, and $260,000 for lost profits in the Mexico
market. The judgment ordered that EC and GSI should have and recover the sum of
$4,360,000.








A.  Collective Damage Award

By its sixth issue, PEI first contends that the collective damages
award is independently barred as a matter of law because the jury did not
determine EC's damages and GSI's damages separately.[10]  Construing this contention as a challenge to
the jury charge, the standard of review is abuse of discretion which
"occurs only when the trial court acts without reference to any guiding
principle."  Tex. Dep't of Human
Servs. v. E.B., 802 S.W.2d 647, 649 (Tex. 1990).

1.  Preservation of Issue

We first address the contention raised by EC and GSI that PEI did not
preserve this issue for our review. 
"A party must make the trial court aware of the complaint, timely
and plainly, and obtain a ruling."  In
the Interest of B.L.D., 113 S.W.3d 340, 349 (Tex. 2003) (citing State
Dep't of Highways & Pub. Transp. v. Payne, 838 S.W.2d 235, 241 (Tex.
1992)).








At the charge conference, PEI objected "to those damage questions
being submitted together.  There is only
one blank to put in total damages for both of those parties, and we would
object to that as it should be separated out."  The trial court overruled PEI's
objection.  PEI's complaint was that EC
and GSI are separate parties and their damages should be determined
separately.  We conclude that, with its
objection, PEI made the trial court aware of its complaint, timely and plainly,
and obtained a ruling.  See id.  Thus, PEI preserved error for our review.

2.  Separate or Collective
Damages

To support its position that separate, not collective damages, if any,
should have been awarded, PEI relies on Minn. Mining and Mfg. Co. v. Nishika
Ltd., 953 S.W.2d 733, 738-39 (Tex. 1997), and Mullen v. Roberts, 423
S.W.2d 576, 578-79 (Tex. 1968).  However,
Nishika and Mullen are distinguishable from the present case and
do not support this contention.

In Nishika, the supreme court certified to the Minnesota
Supreme Court the question of whether the Nishika plaintiffs could
recover damages jointly as a single economic unit.  See Nishika, 953 S.W.2d at 738.  The Minnesota Supreme Court held that they
could not under Minnesota law.  See id.  That court, however, left open for the Texas
courts the procedural question of whether altering the damages award or a new
trial was appropriate.  See id.  Therefore, the issue in Nishika was
not whether the plaintiffs could recover damages jointly but whether the court
should render or remand the case for a determination of proper damages.  See id.  Nishika provides no support for PEI in
this instance.








In Mullen, the Texas Supreme Court concluded "the judgment
should not be for an aggregate sum but should segregate and award to each the
damages or relief to which he is properly entitled."  Using the Mullen court's analysis,
however, we reach a different result in this case.  See Mullen, 423 S.W.2d at 579.  The joint damage award and judgment in favor
of EC and GSI conform with the pleadings, thus distinguishing our facts from
those in Mullen where the judgement did not conform with the
pleadings.  Cf. id.  The cross-claim and third party petition
filed by EC and GSI specifically set out that "it is brought by [EC] and
[GSI], jointly, against [PEI] based upon [PEI's] unjustified, improper,
illegal, intentional, fraudulent, and negligent conduct, causing huge financial
losses and potential economic ruin to [EC] and [GSI]."  No claim or cause of action was asserted
severally.  Neither EC nor GSI claimed
damages in separate sums on the alleged causes of action.  Cf. id. at 578.  Additionally, Texas Rule of Civil Procedure
40 authorizes the joinder in one action of multiple plaintiffs asserting any
right to relief jointly.  See Tex. R. Civ. P. 40; see also Mullen,
423 S.W.2d at 578.

Accordingly, acting with reference to the above guiding principles, we
cannot conclude the trial court abused its discretion in not charging the
damages separately.  See E.B., 802
S.W.2d at 649.

B.  Out-of-Pocket Damages








PEI next contends there is no legally or factually sufficient evidence
to support the jury's award of $3,600,000 for out-of-pocket expenses, described
in the jury questions as "[t]he amount of money spent by [EC and GSI] in
reliance on the promises made by [PEI]." 
PEI complains that while the jury awarded $3,600,000 to EC and GSI as
out-of-pocket expenses, their economic expert, Gilberto de los Santos,
testified that EC and GSI incurred out-of-pocket expenses in the aggregate
amount of $2,703,971.  Thus, PEI argues
that this is no evidence to support the jury's higher verdict award of
$3,600,000.  It further asserts that the
evidence to support even the $2,703,971 amount, including de los Santos's
testimony and that offered by Fink, is legally and factually insufficient
evidence because it is conclusory and based on flawed methodology and
unreliable data, or refers to Group Seven's out-of-pocket expenses,[11]
perhaps not even related to the Playboy project, not GSI's expenses.  PEI also contends Fink's testimony cannot
constitute evidence of out-of-pocket damages because he testified only about
the amount allegedly invested by GSI, without regard to offsetting revenues
that were generated.

However, EC and GSI did provide some evidence of out-of-pocket
expenses through their expert who testified as to "publishing rights"
expense, GSI's expenses and investments in the project, EC's out-of-pocket
expenses, and profit and loss histories. 
He relied on financial statements provided to him by Fink,[12]
conversations with Fink, and records entered into evidence.  Fink also testified that GSI brought in
$4,000,000 in financing[13]
and did not count on having to "use it all up just to stay in business to
put out a Playboy magazine without enough copies to make any money."  Without referring to supporting
documentation, Fink testified that money was spent on launch parties, upgrading
facilities, flying people back and forth, building a staff, and other business
activities.  He also testified that the
company invested at least $2, 500,000 in the business venture.








Based on the above, we conclude that there is legally sufficient
evidence that EC and GSI suffered some out-of-pocket damages as a result of
PEI's fraud, although there is no probative evidence supporting the entire
amount of out-of-pocket damages awarded.  See City of Keller, 168 S.W.3d at 810.

C.  Liabilities Incurred

In addition to the $3,600,000 awarded for out-of-pocket expenses, the
jury awarded damages for liabilities incurred by EC or GSI in reliance on PEI's
promises.  PEI contends that the $500,000
award for liabilities incurred is duplicative of the out-of-pocket expenses
award because it is included in the $3,600,000 award.  Alternatively, PEI urges that the evidence is
legally and factually insufficient to support this award for liabilities
incurred.








De los Santos recognized that "out-of-pocket expenses"
necessarily included amounts borrowed from third parties and then spent on the
PEI project.  Therefore, to the extent
"liabilities incurred" included moneys borrowed from third parties
and spent on the PEI project in this case, such award constitutes a double
recovery and should be disregarded.  See
Waite Hill Servs. v. World Class Metal Works, 959 S.W.2d 182, 184-85 (Tex.
1998) (per curiam).  However, the
evidence also shows that Paramo, GSI's editor-in-chief, was owed $111,000, a
salary amount set out in a contract for his services.  The $111,000 was not money borrowed and then
spent on the PEI project.  It was a
liability incurred; a liability supported by the evidence.  We conclude this amount would not constitute
a double recovery.  Moreover, PEI notes
that the records provided by EC and GSI establish that, at most, $125,000 went
to GSI (of which only $89,000 was invested in EC).  Thus, we conclude there is legally sufficient
evidence that EC and GSI suffered some damages for liabilities incurred as a
result of PEI's fraud, although there is no probative evidence supporting the
entire amount awarded for liabilities incurred.  See City of Keller, 168 S.W.3d at 810.

D.  Lost Profits

1.  Direct Damages

PEI asserts that because lost profits and out-of-pocket expenses are
remedies constituting alternative measures of damages, the jury's award of
$260,000 for lost profits in the Mexico market cannot stand.  The two alternative measures of damages are
benefit‑of‑the‑bargain (lost profits) and out‑of‑pocket
measures.  See Fortune Prod. Co. v.
Conoco, Inc., 52 S.W.3d 671, 681 (Tex. 2000) (citing, e.g., Formosa
Plastics Corp. USA v. Presidio Eng'rs and Contractors, Inc., 960 S.W.2d 41,
49 (Tex. 1998)).  "Benefit‑of‑the‑bargain
damages are the difference between the value as represented and the value
received."  Id.  "Out‑of‑pocket damages
compensate a defrauded party for the difference between the value of that with
which he or she has parted and the value actually received."  Id. 
We have already concluded that there is legally sufficient evidence to
support an award for out-of-pocket expenses in this case.  Therefore, to the extent the jury's award is
for lost profits in the Mexico market, this award is an alternative measure of
damages.[14]








2.  Consequential Damages

"When properly pleaded and proved, consequential damages that are
foreseeable and directly traceable to the fraud and result from it might be
recoverable."  Formosa Plastics,
960 S.W.2d at 49 (citing Arthur Andersen & Co. v. Perry Equip. Corp.,
945 S.W.2d 812, 817 (Tex. 1997)). 
"It is possible that, in the proper case, consequential damages
could include foreseeable profits from other business opportunities lost as a
result of the fraudulent misrepresentation."  Id.








In their petition, EC and GSI sought "recovery against [PEI] for
all damages they have sustained by their fraud and other wrongful conduct, that
is their substantial business losses, lost profits, loss of credibility and
profits in other ventures, and other related damages."  EC and GSI prayed for actual damages, any and
all out-of-pocket losses or expenditures, and any and all lost profits/lost business
opportunity damages, both with respect to the publication at issue and with
respect to other business ventures and relationships.  Construing the pleadings liberally, we
conclude consequential damages in the form of foreseeable profits from other business
opportunities lost as a result of the fraudulent misrepresentation were
properly pled.  See id.  Thus, this element of damages based on the
fraud claim may have been recoverable in this case.  PEI does not challenge the sufficiency of the
evidence to support an award of consequential damages for lost profits, if
any.  Therefore, that issue is not before
us.

E.  Disposition Regarding
Damages








While there is no probative evidence supporting the entire amount of
damages awarded by the judgment, there is legally sufficient evidence that EC
and GSI suffered some damages as a result of PEI's fraud.  Because PEI contested the issue of damages,
we cannot render judgment for a lesser dollar amount.  See Formosa Plastics, 960 S.W.2d at
49.  Instead, we sustain issue six,
reverse the trial court's judgment regarding the fraud claim, and remand for a
new trial on liability and damages related to this claim.  See Fortune, 52 S.W.3d at 682 (Tex. 2000)
(holding that where there is evidence of some fraud damages, but there is no
evidence to support the full amount of damages found by the jury, remand for a
new trial is the appropriate remedy); Formosa Plastics, 960 S.W.2d at 51
(holding that appellate court can remand for new trial when no evidence
supports damages awarded but there is evidence of some damages); Texarkana
Mem'l Hosp. v. Murcock, 946 S.W.2d 836, 841 (Tex. 1997) (holding because
plaintiffs presented legally sufficient evidence that some of the damages
resulted from the complained of conduct, they should be afforded an opportunity
to develop this evidence further); Rente Co. v. Truckers Express, Inc.,
116 S.W.3d 326, 335 (Tex. App.BHouston [14th Dist.
2003, no pet.) (finding evidence legally insufficient to support award, but
sufficient to show plaintiff suffered some damage, court reversed and remanded
for a new trial on liability and damages); but see Springs Window Fashions
Division, Inc., v. The Blind Maker, Inc., 184 S.W.3d 840, 889 (Tex. App.BAustin 2006, pet.
filed) (holding legally and factually insufficient evidence to support award,
but sufficient evidence to support some of the award and suggesting a
remittitur sua sponte).  See
also Tex. R. App. P. 44.1(b)
(appellate court may not order separate trial solely on unliquidated damages if
liability is contested); Johnston v. McKinney Am., Inc., 9 S.W.3d 271,
284 (Tex. App.BHouston [14th Dist.]
1999, pet. denied) (stating appellate courts cannot remand as to damages only)).    

We decline to suggest a remittitur as urged, in the alternative, by
PEI.  Remittitur is not appropriate
because we are remanding for a new trial on liability and damages regarding the
fraud claim.  See Tex. R. App. P. 44.1(b); see also
Rente, 116 S.W.3d at 335.  Moreover,
in the context of this case, we conclude that the interests of justice require
a remand for another trial on the fraud claim and damages related to that
claim.  See Tex. R. App. P. 43.3(b) (providing that
appellate court may remand for another trial when interests of justice require);
Johnston, 9 S.W.3d at 284 (same).

VII.  Pre- and Post-Judgment
Interest








By its eleventh issue, PEI contends it is entitled to new judgment
interest rates if any part of the judgment is affirmed.  PEI argues that amended section 304.003 of
the Texas Finance Code which lowers the post-judgment interest floor to five
percent should apply to the judgment in this case.  See Tex.
Fin. Code Ann. ' 304.003(c) (Vernon Supp. 2005) (providing for
post-judgment interest rate of five percent a year if prime is less than five
percent).

House Bill 4 and House Bill 2415, the bills that amended section
304.003,[15]
set out that the revisions apply to a case in which "a final judgment is
signed or is subject to appeal on or after the effective date" of the
acts.  Bic Pen Corp. v. Carter,
171 S.W.3d 657, 677 (Tex. App.BCorpus Christi 2005,
pet. filed) (quoting Act of June 2, 2003, 78th Leg., R.S., H.B. 4, ' 6.04 (H.B.4); Act of
June 2, 2003, 78th Leg., R.S., ch. 676, ' 2(a) (H.B.
2415)).  "The provisions therefore
apply if the judgment in this case was signed on or after the effective date of
either act, or if the judgment became subject to appeal, that is, capable of
being appealed, on or after the effective date of the act."  See id. at 677-78 (citing Sunbridge
Healthcare Corp. v. Penny, 160 S.W.3d 230, 255 (Tex. App.BTexarkana 2005, no
pet.); see also City of Dallas v. Redbird Dev. Corp., 143 S.W.3d 375,
388-89 (Tex. App.BDallas 2004, no pet.);
Columbia Med. Ctr. of Las Colinas v. Bush, 122 S.W.3d 835, 865 (Tex.
App.BFort Worth 2003, pet.
denied)).








The effective date of September 1, 2003, for House Bill 4 is not in
dispute, and we have recently determined that House Bill 2415 also became
effective on that date. See id. at 678-79.  The judgment in this case was signed and also
became capable of being appealed on October 24, 2002.  See id. at 678.  That date controls the application of section
304.003(c) in this matter.  See Tex. Fin. Code Ann. ' 304.003(c) (Vernon
Supp. 2005).  Therefore, because the
judgment was not signed on or after the effective date of the acts and because
it did not become subject to appeal on or after the effective dates of the
acts, neither House Bill 4 nor House Bill 2415 applies to the judgment in this
case.  PEI is not entitled to new
judgment interest rates.  We overrule the
eleventh issue.

VIII.  Exhibit 248A

In its seventh issue, PEI complains that the trial court erred when it
inadvertently failed to provide exhibit 248A to the jury during
deliberations.  The exhibit was a
sixteen-page transcript of direct testimony provided by Siegel in a separate
California lawsuit.[16]  In that case, Siegel testified that lack of
funding from Admiral Capital Corporation, an investor in Group Seven, GSI's
parent corporation, caused the failure of the PEI project.  Because Siegel's testimony directly
contradicted allegations in the present lawsuit that PEI caused the project to
fail, PEI contends the trial court erred in failing to send the requested
exhibit to the jury room.








The trial court, however, did not refuse to provide the exhibit to the
jury as required by rule 281.  See
Tex. R. Civ. P. 281 (providing
that "[t]he jury may, and on request shall, take with them in their
retirement . . . any written evidence"); see also First Employees Ins.
Co. v. Skinner, 646 S.W.2d 170, 172 (Tex. 1983) (holding rule 281 "is
mandatory and . . . the trial court is required to send all exhibits admitted
into evidence to the jury room during the deliberations" even in the absence
of a requests by jurors or counsel).  The
bill of exception signed by the trial court set out that when the first and
second questions came out from the jury asking for Siegel's testimony, the
trial court met in chambers with all attorneys regarding the exhibit.  Assuming that the jurors had all exhibits and
after identifying the exhibit that contained the requested information as
number 248A, the trial court informed the jurors that the material they were
seeking was contained in exhibit 248A, an exhibit which had been admitted into
evidence.  There is no indication in the
record that, after receiving that information, the jurors informed the trial
court that the exhibit was not found. 
Based on these facts, we cannot conclude that the action of the trial
court was error.








Moreover, even assuming the trial court erred in inadvertently failing
to send exhibit 248A to the jury room upon request, we conclude from an
examination of the entire record that reversible error is not shown.  See Tex.
R. App. P. 44.1(a).  During the
trial, both counsel for EC and counsel for PEI had an opportunity and did, in
fact, read excerpts from exhibit 248A, Siegel's California trial testimony,
into the record.  The jury heard the
excerpts read at the time the exhibit was introduced into evidence.  EC's counsel read testimony concerning how,
after entering into an agreement with Admiral for funding, its president wanted
a change of terms and conditions.  This
was not acceptable to Siegel who then asked for a release from the agreement so
that he could pursue other financing which was at that time "surely
needed."  PEI's counsel also read
excerpts that provided information regarding the success of Group Seven through
1997 and statements that the success would have been much greater had Admiral
funded as agreed.  From the excerpt read
by PEI's counsel, Siegel testified that, because of the exclusivity of the
agreement with Admiral, he lost other opportunities to raise capital.  The following exchange was also read to the
jury:

Q:  As a result of the failure of Admiral to make
the additional investment in Group Seven, how has Group Seven been damaged?

 

A:  The Playboy license was terminated because of
lack of funding.

 

Thus,
the jury was aware of Siegel's statements regarding Admiral's involvement in
the matter.

In addition, when called to testify in this case, Fink, GSI's
corporate representative, was asked questions about the California lawsuit and
Admiral's agreement with Group Seven to provide investment monies for a variety
of projects.  Fink testified that the
purpose of raising money from Admiral was to provide extra funding for the
company . . . because it was "starting to run short of its cash, based on
the projections of . . . its time line [to launch the magazine] starting to get
stretched out."  In further
questioning of Fink, PEI counsel also read the following:

As set forth in the
accompanying declaration of Bob Byer[, GSI's director, secretary and treasurer,]
based on Admiral's conduct, Group Seven has lost the licenses held with Playboy
. . . .  Admiral failed to fully fund its
2.1 million equity obligation causing Group Seven damages in excess of those
sought by Admiral.  Group Seven is now
involved in litigation with . . . Playboy . . . as set forth in the Siegel
declaration.  The lack of admiral funding
has prevented the . . . publishing and distributing the company's . . . Spanish
language Playboy through the [GSI] subsidiary to the Hispanic marketplace in
the United States and throughout Central and South America.  The lack of funding has deleteriously
impacted Group Seven's relationship.

 








Based on the above, the exhibit at issue was cumulative of other
evidence the jury considered.  Therefore,
even if the exhibit had been excluded from the jury's deliberations at trial, a
new trial would not be ordered.  See
Interstate Northborough P'ship v. State, 66 S.W.3d 213, 227 (Tex. 2001)
(holding error in the admission or exclusion of evidence is harmless if
cumulative).  The error was not such as
would probably cause the rendition of an improper judgment or prevent PEI from
presenting its case to this Court. 
See Tex. R. App. P. 44.1(a).  PEI's seventh issue is overruled.

IX.  Realignment of EC and GSI
as Plaintiffs








By its eighth issue, PEI contends the trial court improperly realigned
EC and GSI as plaintiffs for purposes of final argument because Gongora was the
primary plaintiff and because PEI, EC, and GSI were all equally positioned as
defendants/cross-plaintiffs.  Texas Rules
of Civil Procedure 266 and 269(a) provide for a party's right to open and close
argument.  See Tex. R. Civ. P. 266, 269(a). 
Rule 266 begins with the following words:  "Except as provided in Rule 269 the
plaintiff shall have the right to open and conclude both in adducing his
evidence and in the argument."  Id.
at rule 266.  Rule 269(a) sets out, in
effect, that the party having the burden of proof of the whole case or on all
matters which are submitted by the charge shall be entitled to open and
conclude the argument.  Id. at
rule 269(a).  It also provides
"where there are several parties having separate claims or defenses, the
court shall prescribe the order of argument between them."  Id. 
In this case, as noted by PEI above, Gongora was the primary plaintiff
and PEI, EC, and GSI were all equally positioned as
defendants/cross-plaintiffs; thus, there were several parties with separate
claims or defenses.  The trial court
shall prescribe the order of argument in such a case.  See id.  Thus, the trial court did not err in allowing
EC and GSI to open and close final argument.

PEI also asserts this alleged error is particularly egregious because,
when the case was earlier removed to federal court, EC and GSI strenuously
argued that they should not be realigned as plaintiffs for purposes of federal
removal jurisdiction.  It claims the
trial court should have held that EC and GSI were estopped and otherwise should
have been precluded from arguing that they should be realigned as plaintiffs
after the case was remanded to state court. 
See Gen. Agents Ins. Co. v. Home Ins. Co., 21 S.W.3d 419, 427
(Tex. App.BSan Antonio 2000, pet.
dism'd) (judicial estoppel "precludes a party from asserting a position in
a legal proceeding inconsistent with a position taken by that party in the same
or a prior litigation"). 
Interestingly, our review of the record reveals that PEI, itself, argued
that EC and GSI should be realigned as plaintiffs in that same earlier
proceeding in an effort to remove the case to federal court.  Thus, using this analysis, PEI, too, should
be estopped from taking its present position on this issue.  Under the facts of this case, we cannot conclude
this argument supports PEI's position. 
We overrule this eighth issue.

X.  Breach of Contract and
Excuse[17]








By its first issue, PEI contends that EC and GSI cannot recover for
breach of the License Agreement.  PEI
also contends, by its ninth issue, that EC and GSI, as EC's assignee under the
License Agreement, are liable for breach of contract as a matter of law and
that there is no evidence that EC's failure to comply with the License
Agreement was excused.  However, because
of our disposition of the fraud issue and the interrelated nature of the breach
of contract and fraud claims, we will not address these contentions at this
time.  See Tex. R. App. P. 43.3(b) ("When reversing a trial court's
judgment, the court must render the judgment that the trial court should have
rendered, except when . . . the interests of justice require a remand for
another trial."); id. at rule 47.1 (setting out that a written
opinion must be as brief as practicable addressing every issue raised and
necessary to final disposition of the appeal).

XI.  Conclusion

Accordingly, we reverse the trial court's judgment, in part, and
render judgment that EC and GSI take nothing on their tortious interference,
fiduciary duty, and wrongful disparagement claims.  We reverse the judgment of the trial court,
in part, and remand the parties' fraud claims to the trial court for a new
trial.  In the interest of justice, we
also remand the parties' contract claims to the trial court for a new
trial.  See id at rule 43.3(b).

 

NELDA
V. RODRIGUEZ

Justice

 

Opinion delivered and
filed 

this 25th day of May,
2006.











[1]Eduardo Gongora, who is in the
business of selling and soliciting advertisements for products in different
forms of media, sued PEI, EC, and GSI for failing to publish a Spanish language
edition of Playboy in Mexico and to distribute it in the United States. Gongora lost on all of his claims in the trial court and is not a party
to this appeal.





[2]The trial court set out in its
judgment that the following jury findings should be disregarded as immaterial
findings or incomplete submissions:  (1)
EC failed to comply with the License Agreement; (2) EC and/or GSI failed to
comply with the Renegotiated Payment Plan; (3) EC committed fraud against PEI;
(4) GSI committed fraud against PEI; and (5) EC and/or GSI failed to comply
with the terms of the asset purchase agreement and other contracts executed
between them.





[3]The Spanish language version of the
magazine is titled Playboy Un Estilo De Vida.





[4]Javier Sanchez Campuzano (Sanchez),
EC's president and principal, signed the License Agreement on behalf of
EC.  GSI was EC's assignee of the U.S.
distribution rights to the Spanish language version of Playboy.  Paul Siegel was GSI's principal.  It is undisputed that GSI assumed EC's
obligations under the License Agreement and expressly agreed to be bound by the
License Agreement's terms and conditions.





[5]"Cannibalization" is described,
in this case, as hurting the U.S. sales of PEI's Engligh-language version by
distributing a Spanish language edition in the United States and as head to
head competition with the U.S. Playboy.





[6]While the Texas Supreme Court has
not yet adopted section 551 of the second restatement of torts that is the
basis for a general duty to disclose facts in a commercial setting, it has
acknowledged that several courts of appeals have held a general duty to
disclose information may arise in an arm's length business transaction when a
party makes a partial disclosure that, although true, conveys a false
impression.  See Bradford v. Vento,
48 S.W.3d 749, 755-56 (Tex. 2001) (citing Restatement
(Second) of Torts ' 551 (1977); Hoggett v. Brown, 971
S.W.2d 472, 487 (Tex. App.BHouston [14th Dist.] 1997, pet. denied); Ralston Purina
Co. v. McKendrick, 850 S.W.2d 629, 633-36 (Tex. App.BSan Antonio 1993, writ denied)); see
also SmithKline Beecham v. Jane Doe, 903 S.W.2d 347, 352 (Tex. 1995).





[7]During October 1996, O'Donnell
faxed the following internal memo to Siegel and Sanchez.  Among other things, O'Donnell wrote,

 

Hef's direction was that while
Spanish language might be an OK idea, there can be only one U.S. Playboy.  All we could do was to create an exact high
quality translation of USPB.  As this
would have been in our minds the absolute worst approach to take, (image,
cannibalization and relevance), I decided to look at the side door with the
front door now barred.

 

I set up a meeting between the
President of Sports Time, Paul Siegel, and our Mexican Publisher, Javier
Campuzano, whose license was up for renewal at the end of this year, and who,
with the economic crisis in Mexico, was having cash flow and payment problems
and was trying to sell assets to raise money.

 

The basic purpose was to explore the concept of using cash that Sports
Time could raise to invest in (1) upgrading the quality of the core Mexican
Edition and support its recovery parallel with economic stabilization (2)
creation of local market tailored versions of the edition for export to other
Spanish speaking markets of South/Central America, (not large or yet strong
enough for their own editions), and (3) do a US Hispanic targeted version as
soon as we could develop an acceptable positioning and pass the quality test.





[8]EC and GSI argue that this case is
distinguishable from St. Joseph Hosp. v. Wolff, 94 S.W.3d 513, 527-28
(Tex. 2002), because PEI retained rights to approve the quality of the Spanish
Language edition.  Such approval rights,
however, do not distinguish Wolff. 
See id. at 528 (explaining that "both parties to an
agreement may have 'a common business interest,' 'a common pecuniary interest,'
or both, despite lacking a community of pecuniary interest in the
purpose").





[9]EC and GSI do not complain on
appeal of the failure of the jury to award any money for lost profits in the
United States market.





[10]"FOR GSI" was written
beside the $500,000 liabilities award and "FOR EDITORIAL" beside the
$260,000 lost profits award.  However,
"[a] jury's marginal notations generally may not be considered on
appeal."  Wal‑Mart Stores, Inc.
v. Alexander, 868 S.W.2d 322, 328 (Tex. 1993); see Thomas v.
Oldham, 895 S.W.2d 352, 359 (Tex. 1995) (setting out that an appellate
court "cannot consider the margin notations as separate damage awards for
purposes of evidentiary review"); First Nat'l Bank in Dallas v.
Zimmerman, 442 S.W.2d 674, 678 (Tex. 1969) (providing that the jury's
"handwritten notation was not the jury's verdict; it merely reflected the
jury's mental processes in arriving at their verdict. . . .  The jury's reasons for reaching a particular
verdict are irrelevant, at least in the absence of some overt act of
misconduct.").  Therefore, as the
parties do not argue differently, for purposes of our review, we will not
consider the margin notations as separate damage awards.





[11]Group Seven is GSI's parent
company.





[12]PEI also challenges the use of
unaudited statements provided by Fink, statements PEI asserts had no bases in
reality.





[13]PEI asserts that Fink is referring
not to GSI but to its parent company, Group Seven.





[14]PEI asserts there is no evidence of
lost profits in the Mexico market.  PEI
complains that the only lost profits testimony came from de los Santos, whose
testimony PEI contends is "wholly speculative and out of touch with
reality."  In this case, however,
the evidence includes a table showing EC's profits from 1989 until 1998.  While net losses are shown in 1994 and from
1996 to 1998, net profits are shown from 1989 to 1993 and in 1995, with the
greatest net profit of $2.5 million in 1990. 
De los Santos used information from past development and existing
conditions, economic indicators, and market and industry data to develop his
opinions regarding lost profits.  While
the two-month baseline of actual production upon which he based his projected
future revenues in Mexico is a relatively short period of time, it is a
corresponding period of time upon which de los Santos could obtain data.  Among other things, de los Santos utilized
increases in monthly sales and increases in the target population of men, ages
20-59, to determine lost profits.  From
this data, lost profits may be ascertained with a reasonable degree of
certainty and exactness.

 

It is unclear, however, how the
jury determined lost profits in Mexico, apart from lost profits in the United
States, Puerto Rico, Venezuela, and the Conosur Region.  When de los Santos transformed his revenue
projections into profit projections, he did not specifically calculate lost
profits for Mexico.  Rather, his
projections referenced the aggregate lost profits for Mexico, the United
States, Puerto Rico, Venezuela, and the Conosur Region.  Although the evidence does not support the
specific award of lost damages the jury made, we conclude there is legally
sufficient evidence that EC and GSI suffered some damages for lost profits in
Mexico that were incurred as a result of PEI's fraud.  See City of Keller v.
Wilson, 168 S.W.3d 802, 810 (Tex. 2005).





[15]"House Bills 4 and 2415
amended section 304.003(c) of the finance code, reducing the effective post-judgment
interest rate from ten to five percent." 
Bic Pen Corp. v. Carter, 171 S.W.3d 657, 677 (Tex. App.BCorpus Christi 2005, pet. filed)
(citing Act of June 2, 2003, 78th Leg., R.S., H.B. 4, ' 6.04 (H.B. 4); Act of June 2,
2003, 78th Leg., R.S., ch. 676, ' 2(a) (H.B. 2415)).





[16]See Admiral Capital Corp. v.
Group Seven Communications, Inc., Paul Siegel, Robert Byer, and Jonathan Fink,
No. SACV 99-00198-DOC(EEx) (U.S. D. for the W. Div. C.D. of Cal., April 1,
1999).





[17]Without additional briefing, PEI
identifies in the "Issues Presented" section of its brief a tenth
issue; that the evidence is legally and factually insufficient to support any
of the jury's liability and damage findings challenged by PEI in its
brief.  We have already, however,
discussed sufficiency issues that were adequately briefed.  Therefore, we need not address PEI's tenth
issue.